[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12034
_____

D.C. Docket No. 3:09-cv-00074-WSD


FREDERICK R. WHATLEY,

Petitioner-Appellee
Cross Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC
AND CLASSIFICATION CENTER,

Respondent-Appellant
Cross Appellee.

_____

Appeals from the United States District
Court for the Northern District of Georgia
_____

(June 20, 2019)

Before TJOFLAT, JORDAN, and HULL, Circuit Judges.

TJOFLAT, Circuit Judge:

Frederick R. Whatley ("Petitioner") murdered a bait shop owner in Georgia in 1995. He was convicted and sentenced to death.[1] After the Supreme Court of Georgia affirmed his convictions and death sentence, *Whatley v. State*, 509 S.E.2d 45, 53 (Ga. 1998), he petitioned the U.S. District Court for the Northern District of Georgia for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleged that his lawyer provided ineffective assistance of counsel[2] (1) by failing to investigate and present mitigating evidence during the penalty phase and (2) by failing to object when he testified before the jury during the penalty phase in shackles. The District Court granted relief on the first claim and denied relief on the second. Both parties appeal. We reverse on the first claim and affirm on the second.

Our opinion proceeds in seven parts. Part I recounts the trial proceedings, with an emphasis the penalty phase. Part II briefly describes the direct appeal. Part III explains the evidence that Petitioner presented to the state habeas court and

---

[1] Along with malice murder, Petitioner was convicted of five other offenses, all committed in conjunction with the murder: "aggravated assault (two counts), armed robbery, motor vehicle hijacking, and possession of a firearm during the commission of a crime." *Whatley v. State*, 509 S.E.2d 45, 47–48 (Ga. 1998). He received a life sentence for the armed robbery offense and terms of imprisonment for the remaining offenses. *Id.* at 48.

The indictment also charged Petitioner (1) with being a felon in possession of a firearm, but the State dismissed the charge before trial, and (2) with felony murder, but the jury acquitted on this charge. *Id.* at 48 n.1.

[2] The Sixth Amendment was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Parker v. Gladden*, 385 U.S. 363, 364, 87 S. Ct. 468, 470 (1966) (per curiam). The Supreme Court laid out the standard that governs ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

notes that Court's decision.  Part IV explains the Supreme Court of Georgia's decision, which is the decision we effectively review on appeal.  Part V recounts the District Court's decision, and Part VI takes up the two issues on appeal.  Part VII concludes.

## I.

Petitioner was indicted for murder in June of 1996.  *Whatley*, 509 S.E.2d at 48 n.1.  The Superior Court for Spaulding County, Georgia, appointed Johnny B. Mostiler ("Trial Counsel"), the Spaulding County Public Defender, to represent Petitioner 12 days after his arrest.  *Whatley v. Schofield*, No. 99-V-550, slip op. at 5 (Ga. Super. Ct. Nov. 29, 2006) (order denying habeas relief).  He was convicted by a jury in January of 1997.  *Whatley*, 509 S.E.2d at 48 n.1.

This appeal focuses on how Trial Counsel performed in preparing for the penalty phase of Petitioner's trial and in representing Petitioner during that phase. We must analyze Trial Counsel's conduct under the performance standard set out in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).  To decide whether Petitioner satisfied *Strickland*'s prejudice standard, we must consider the strength of the State's case.  Specifically, what should Trial Counsel have anticipated the State would present in the guilt-innocence phase and, if the jury found Petitioner guilty of murder, what additional evidence would the State present

3

in the penalty phase to persuade the jury to recommend a death sentence?[3]  The

Superior Court of Butts County (the "State Habeas Court"), which heard

Petitioner's habeas petition, described Trial Counsel's decision this way:

> [Trial Counsel] was confronted with a conundrum of trying to defend a death penalty case by denying the obvious guilt of his client, and asserting defenses where there were none and then trying to convince the jury of the defendant's credibility and worthiness as a human being when it came to the [penalty] phase of the trial.

*Whatley*, slip op. at 5 (order denying habeas relief).

We recount the guilt-innocence phase and the penalty phase separately.

## A.

Trial Counsel defended Petitioner by putting the State to its proof—that

appeared to be the only available defense strategy.

At the time of the murder, Petitioner had recently arrived in Georgia after

escaping from a halfway house in Washington, D.C.  Shortly after arriving,

Petitioner told a cousin that he needed a gun to "make a lick," to commit a robbery.

Here's how he made the lick.  He walked into a bait shop and pulled out a

gun.  *Whatley*, 509 S.E.2d at 48.  He forced an employee to lie down behind the

---

[3] The district attorney who prosecuted the case against Whatley had an "open file" policy in cases in which Trial Counsel represented the defendant, and this case was no exception. *Whatley*, slip op. at 5 (order denying habeas relief).  "This meant that, by having access to the prosecution's files, [Trial Counsel] did not have to spend a great deal of time to determine what the prosecution's evidence was likely to be."  *Id.* at 5–6.  In addition to accessing the prosecutor's files, Trial Counsel had the unlimited services of his Public Defender's Office Investigator.  *Id.* at 5.

counter, pressed the gun against the employee's head, and told another person, the storeowner, to give him the money from the register. *Id.* The storeowner complied and put the money in a sack on the counter; Petitioner grabbed the sack and fired two shots. *Id.* One shot hit the storeowner in the chest, "pierc[ing] his left lung." *Id.* Petitioner fired this shot, according to expert testimony, while standing just 18 inches from the storeowner. *Id.* The second shot missed its mark—Petitioner tried to shoot the employee (still lying behind the counter) in the head, but the bullet hit the counter and missed. *Id.*

Petitioner left the store and ran into a man who was getting out of his car. *Id.* Petitioner forced the man back inside the car and told the man to take him where he wanted to go. *Id.* Before the car could leave, the "mortally wounded" storeowner grabbed a gun from the store and fired "several shots" at Petitioner. *Id.* Petitioner returned fire, and the storeowner eventually collapsed and died from bleeding caused by the first gunshot. *Id.* Petitioner dropped the sack of money and fled on foot; the man in the car noticed that Petitioner was limping. *Id.*

Officers arrived on the scene, and both the employee and the man who Petitioner tried to carjack told them the attacker had used a "silver revolver." *Id.* The day before, one of the officers had taken a report from a man who said that his silver revolver was missing; he suspected his cousin—Petitioner—had taken it. *Id.* The officers located Petitioner, who was staying with a relative. *Id.* Sure enough,

5

he had a bullet wound in his leg, and the officers found the missing silver revolver under his mattress. *Id.* A firearms expert concluded that the missing silver revolver was in fact the murder weapon. *Id.*

There was more. "The police also found a bloody pair of thermal underwear with a bullet hole in the leg, a bloody towel, and bloody boxer shorts in a trash can behind the house." *Id.* Officers removed a bullet (one that matched the caliber of the murder weapon) from the car that Petitioner tried to carjack. *Id.* There were fibers on the bullet, and the fibers "were consistent with fibers from the thermal underwear, and DNA taken from blood on the fibers matched [Petitioner]." *Id.* Petitioner's palm print was on the sack of money that was dropped outside the store when the attacker fled. *Id.* at 48–49.

Based on this evidence, the jury found Petitioner guilty of malice murder. *Id.* at 49.

### B.

A month after the grand jury indicted Petitioner, the State filed a notice of intent to seek the death penalty. *Whatley*, slip op. at 6 (order denying habeas relief).[4] To support its request for death, the State would argue that one or more of

---

[4] Under Georgia law, "A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." O.C.G.A. § 16-5-1(a). The indictment alleged that Petitioner killed the storeowner "with malice aforethought." Although the notice was filed a month after Petitioner was indicted, "it had been

these three aggravating circumstances applied: (1) Petitioner committed the murder

while engaged in armed robbery, (2) Petitioner committed the murder to obtain

money, or (3) Petitioner committed the murder after he had escaped from a place

of lawful confinement.  The State also told Trial Counsel that it would rely on

Petitioner's convictions and probation revocations—in 1988, 1989, and 1990—

from Washington, D.C., to establish the aggravating circumstances.  Trial Counsel

was well aware of this evidence and planned to counter it with evidence that

showed (1) Petitioner's life was worth saving and (2) that life imprisonment would

be sufficient punishment.[5]

We recount the penalty phase chronologically.  We begin with the State's

case and then consider Petitioner's response.  We end with closing arguments.

1.

The State relied on the evidence presented during the guilt-innocence phase

to establish the first aggravating circumstance—that Petitioner committed the

murder while engaged in armed robbery—and the second aggravating

circumstance—that Petitioner committed the murder to obtain money.  It relied on

records from the District Court for the District of Columbia and the D.C. Superior

---

assumed that this case was likely to involve death penalty issues," apparently from the very
beginning.  *Whatley*, slip op. at 6 (order denying habeas relief).

[5] We go into considerable detail in describing the parties' presentations in the penalty
phase.  We do so because what happened in that phase shaped Petitioner's collateral attack in
state court.

Court to establish the third aggravating circumstance—that Petitioner committed the murder after escaping from a place of lawful confinement.

The State also used these records to show the extent of Petitioner's criminal history and to paint a broader picture of him. Using the records, the State argued that this murder wasn't Petitioner's "first brush with the law" and that he had "every break possible" to turn things around but failed to do so. The records showed, according to the State, that Petitioner had a history of violence and would always be dangerous.

There are lots of records, and they are, at times, quite convoluted. For the reader's sake, we hit the records' high points, and we explain only those records that are necessary for our analysis.

The records show that Petitioner was charged in three separate criminal cases from 1988 to 1990: (1) he forged a U.S. Treasury check, (2) he robbed a man at gunpoint, and (3) he assaulted a woman in public. The judicial proceedings in these cases overlapped, and many times, what happened in one case affected something in the other. Thus, rather than dividing our discussion by offense or topic, we explain the records chronologically.

In January of 1986, Petitioner stole a U.S. Treasury check, forged the payee's signature, and negotiated the check. In January of 1988, he also robbed a man at gunpoint. He was indicted in the District Court for the forgery, *United*

*States v. Whatley*, No. CR 88-030 (D.D.C.), and he pled guilty in May of 1988.

Petitioner was indicted in the Superior Court for the armed robbery,[6] *United States v. Whatley*, No. F-1046-88 (D.C. Super. Ct. Crim. Div.), and he pled guilty to a lesser charge of robbery in April of 1988.

During the plea colloquy in the robbery case, Petitioner admitted that he "put a loaded shotgun . . . to the [victim's] back and demanded [his] wallet which he forcibly took from [the victim]. . . . [Petitioner] was arrested that same day . . . and the . . . loaded shotgun and shells were recovered." The Superior Court accepted the guilty plea and ordered that Petitioner be "committed" to the D.C. Department of Corrections "for observation and study" under the Youth Rehabilitation Act (the "YRA")[7] before sentencing. He would be sentenced after the studies were finished.

Later in April of 1988, Petitioner was sentenced in the forgery case. He was ordered to reside at the Hope Village Community Treatment Center for four months and to participate in a drug treatment program. But Petitioner wasn't taken

---

[6] The indictment alleged that Petitioner, "while armed with a dangerous weapon, . . . a shot gun, by force and violence, against resistance and by putting in fear, stole . . . from . . . Fredy Magallanes, property . . . consisting of a wallet and its contents."

[7] Youth Rehabilitation Act of 1985, D.C. Code §§ 24-901 to 24-907. "The objectives of the YRA are to give the court flexibility in sentencing youthful offenders, separate youth from older and more mature offenders, and provide an opportunity for youth to have the sentence 'set aside' in the future if the youth satisfies the conditions of the sentence." Ellen P. McCann, *The District's Youth Rehabilitation Act: An Analysis* 9 (Sept. 8, 2017) (footnote omitted), https://cjcc. dc.gov/sites/default/files/dc/sites/cjcc/page_content/attachments/District%27s%20YRA-An%20Analysis.pdf.

9

to Hope Village immediately and remained incarcerated until there was room for him at Hope Village.  Between April and June of 1988, Petitioner was evaluated according to the YRA.  In August of 1988, Petitioner was also given a neuropsychological evaluation, which his caseworker, Eugene Watson ("Caseworker Watson") arranged.  As we explain below, Petitioner relies heavily on these reports and evaluations from 1988 to support his habeas petition.

Sentencing in the robbery case was continued several times.  Finally, in March of 1989, the Superior Court held the sentencing hearing.  At the hearing, Petitioner's lawyer presented a sentencing plan that was created by Caseworker Watson.[8]  Petitioner's lawyer asked the Court to sentence Petitioner to a term of probation, conditioned on Petitioner's following the sentencing plan.[9]  The Court agreed and sentenced Petitioner as follows: "Five to fifteen years [imprisonment] with the execution suspended with a five year period of probation with the condition that he enter and complete the New Life [for Youth] Program, both residential and aftercare."[10]

---

[8] Caseworker Watson was a program developer with the D.C. Public Defender Service, and his job was to develop rehabilitation plans for defendants awaiting sentencing in the Superior Court.

[9] The sentencing plan called for Petitioner to enter the New Life for Youth residential facility to undergo twelve months' inpatient mental health care followed by six months of formal aftercare as an outpatient.

[10] Of course, this sentence conflicted with Petitioner's sentence in the forgery case.  He couldn't be at Hope Village and New Life at the same time.  But the Superior Court still ordered

Petitioner was never taken to the New Life for Youth facility. Instead, he was taken to the Hope Village facility the next month, consistent with his sentence in the forgery case. He absconded from Hope Village about two months later. In turn, his probation in the forgery case was revoked, and he was incarcerated for two months.

In light of this, the Superior Court ordered Petitioner to show cause as to why his probation should not be revoked in the robbery case. The Court held a hearing in December of 1989, and, rather than revoking probation, it modified the terms of Petitioner's release.[11]

Fast forward to September of 1990; the Superior Court again ordered Petitioner to show cause as to why his probation should not be revoked in the robbery case. It held a hearing the next month—Petitioner didn't appear, and the Court issued a bench warrant for his arrest.

Seven days after the Court issued the bench warrant, Petitioner was arrested for assaulting a female. He was charged in the Superior Court with "assault with

_____

the sentence because Petitioner's lawyer mistakenly thought that the District Court had suspended the execution of the sentence in the forgery case.

[11] We glean this information solely from the case docket sheet, which shows that on December 15, 1989, Petitioner, his attorney "and P.O. [were] present. Show cause hearing held. Order to show cause discharged. Probation modified (illegible); drug surveillance by P.O. Participation in out patient program at New Life . . . ." Under the modified terms, Petitioner was required to submit to drug testing monitored by his probation officer and to participate in an outpatient program with New Life for Youth.

intent to rape."[12]  *United States v. Whatley*, No. F 11978-90b (D.C. Super. Ct. Crim. Div.).  In December of 1990, he pled guilty to a lesser charge, simple assault.  The Court sentenced Petitioner to the custody of the Attorney General for one year.

Finally, in late December of 1990, the Superior Court held a hearing on its show cause order, the order that directed Petitioner to show why his probation should not be revoked in the robbery case.  The Court focused on the assault charge that Petitioner had recently pled guilty to and been sentenced for.  The question was whether the assault established cause for revoking Petitioner's probation.  The Court noted the "Herculean efforts [that] were made" to help Petitioner deal with "difficult personality, and perhaps psychological, problems that he had."  It then noted that this was the second probation revocation hearing, and the Court highlighted that Petitioner committed the assault after having been served with a bench warrant for his arrest.

Next, the Court turned to the facts of the assault.  Even after considering Petitioner's "dubious" version of the incident,[13] and giving Petitioner "the most benefit of the doubt," the Court noted that Petitioner showed "some violent

---

[12] The information alleged that Petitioner "unlawfully assaulted and threatened [Jane Doe] in a menacing manner," "[i]n violation of Section[] 22-504, District of Columbia Code." This is a felony.

[13] Petitioner's version was set out in the presentence report that was submitted to the court overseeing the assault charge.

12

behavior with somebody . . . in a way that . . . could have been quite dangerous."

The Court went on and described the incident "as a significant outburst of violent

behavior by somebody who was then on the run from me for a prior criminal act of

violent behavior, namely a robbery." It concluded with this: "I think there have

been serious violations of the probation, here, in the case of somebody who's been

given lots and lots of chances . . . to try to stay out of Lorton [prison] on a long-

term basis. And, I think he basically blew it."[14] The Court revoked Petitioner's

probation and sentenced him to prison for a term of 4 to 12 years.

Petitioner was incarcerated in Lorton Reformatory immediately. He was

released 47 months later, in November of 1994, and put in a halfway house in

Washington, D.C. He fled on December 2, 1994, and became a fugitive from

justice. He was still a fugitive when he returned to Georgia in January of 1995.[15]

2.

---

[14] The Court acknowledged that Petitioner may have lived a somewhat difficult life, but that did not give Petitioner license to disregard the law:

> [A]t some point or another the community, speaking through this judicial system, has a right to say, look, we're sorry if you have problems in life. A lot of us ha[ve]. You can't go around beating up on people. And, if that message doesn't come through probation or other mechanisms, then it may ultimately have to come through incarceration.

[15] The State presented three witnesses to supplement the records. First, it presented a criminal investigator who worked for the D.C. Department of Corrections. Her job was to arrest offenders who escaped from the Department's halfway houses. She testified that—nine days after being put in the halfway house—Petitioner signed out to go to work and never returned. Second, the State presented a police detective who worked on Petitioner's robbery case. Third, it presented the victim Petitioner robbed at gunpoint.

13

Trial Counsel countered the State's case with nine witnesses; collectively, they portrayed Petitioner's life as worth saving. We focus on three witnesses—Janet Wyche, Lorraine Goodman, and Cleveland Thomas, Jr.—because Petitioner also submitted their testimony in his habeas proceedings. Petitioner testified himself and expressed remorse for what he had done, and Caseworker Watson testified as well.

As a brief introduction, we note that Petitioner was raised by his great-aunt and great-uncle, Marie and Cleveland Thomas. He moved to Washington, D.C., to live with his mother a couple of time during his teenage years. The criminal history that we just explained took place in Washington, D.C. And at the time of the murder, he had just returned to Georgia from Washington, D.C., after escaping from a halfway house. Petitioner explained this during his testimony, which we discuss below.

Janet Wyche knew Petitioner before he went to live with his mother in Washington, D.C. When he returned to Georgia, Petitioner stayed off and on in the same house where Ms. Wyche lived. She said he was nice and got along with everyone. Ms. Wyche didn't comment on Petitioner's childhood or his experience living with the Thomases.

Lorraine Goodman is related to Petitioner. She described him as respectful and knew that he was raised by the Thomases, who took him to church every

14

Sunday.  She was unaware of Petitioner getting into any trouble while living with the Thomases.  She said that Petitioner stayed at her house when he returned to Georgia from Washington, D.C.; she asked him to leave because they could not afford to have another person in the house.  She claimed that Petitioner looked for a job every day while staying with her, and she said her children "loved him."

Cleveland Thomas, Jr.'s father and stepmother raised Petitioner.  He said that as a child growing up, Petitioner was "real nice," had good manners, and did well in school.  He "thought the sky was the limit for him," and he asked the jury to "spare [Petitioner's] life."

Five other witnesses testified and generally said positive things about Petitioner.

Next, Trial Counsel called Petitioner himself to the stand.[16]  Petitioner first explained his upbringing.  As a child, he was told that his mother "had some problems," so she left him with his great-aunt and great-uncle (the Thomases), who raised him.  He described the Thomases' household as "very stationary, very unconditional as far as . . . loving and . . . support, and ideally everything that a child could . . . ask for growing up."  In eighth or ninth grade, he went to live with his mother, brothers, and sisters in Washington, D.C.—he "had a yearning . . . to be part of [his] family."  But life there was chaotic, and his mother kicked him out

---

[16] Petitioner was wearing shackles that were visible to the jury while he testified.

15

after the two got into a fight.  He returned to Georgia.  At 19, he moved back

because he still wanted to be with his mother and siblings.  Back in Washington,

D.C., he "assumed the position of head of the household."  But that deteriorated

because his mother was taking money from him, and he moved out.

Petitioner then addressed his involvement with drugs and said he started out

dealing drugs for a profit.  He noted that he has "always had some dealings in the

streets."  Next, Petitioner explained his criminal history.  He said "trouble came

along" when he "got introduced to . . . and . . . associated with some individuals

that were into forgery and uttering and credit cards, white collar crimes."  As for

the robbery, Petitioner claimed he "did not have the shotgun on" him during it.  He

said the victim owed him money, and he stuck a "closed knife" in the victim's

back.  He claimed the shotgun was around the corner during the robbery, and after

taking the victim's money, he was going to retrieve the gun.

Petitioner also explained why he violated his probation in the forgery case.

He said he was required to stay at Hope Village[17] for four months, but he got in

trouble by taking "a furlough."  He claimed he was unaware that he wasn't

supposed to leave the facility.  When he returned, his supervisor "placed [him] on

---

[17] He actually called it a halfway house, but Hope Village was not the sort of facility where convicted persons reside after being released from a prison but before they are discharged from custody.

16

restriction." The next night, another staff member let him out, and he was considered an escapee.

Moving on to his probation sentence in the robbery case, Petitioner noted that he worked with Caseworker Watson "on a regular basis . . . for a couple of years." He said they stopped working together when he went "on the run." He was on the run because he hadn't reported to his probation officer, and there was a warrant out for his arrest.

Then, Petitioner explained why he escaped from the halfway house in December of 1994. The night he escaped, Petitioner said, he left work early and went to visit an ex-girlfriend. There was a curfew, and he realized he would be cutting it close, so he called the halfway house and asked for an extension. It was denied. So, Petitioner tried to catch a cab, but he was in a part of town where it was "very difficult" "for a black male to catch a cab that time of night." He called the halfway house again, and he was told that he should still be able to make curfew. He finally found a cab, but the driver had to go pick up another passenger in Maryland. Petitioner explained that he had a curfew, and the driver told Petitioner to give him $25—he didn't have that much money, so the driver just let him out in Maryland. At this point, he had missed curfew, and he didn't report back to the halfway house.

17

Petitioner bounced around and stayed with different friends and family members.  He came back to Georgia hoping to get a job and make some money.  Once in Georgia, he continued to stay with other people, and he eventually stole a pistol from a man he was staying with.  He stole the pistol because had been selling drugs and needed to go to "rough neighborhoods" to sell.  There were also people who owed him money, Petitioner said.  On the night of the murder, "it just so happened" that he got a ride and "passed by" the bait shop.  He "felt like it was in a secluded area," so he could "go in," "get the money," and "get out of town."

Finally, Petitioner explained how he wound up shooting the victim.[18]  He said he took the money and was backing out of the shop without looking at the door.  He heard someone coming to the door and turned around—at that point, the victim grabbed a gun.  Petitioner turned back, apparently saw the gun, and fired a shot.  This shot, Petitioner claimed, was the one that hit the counter.  Petitioner backed out of the shop and ran into a person trying to enter.  By this time, the victim had fired his own shot, and Petitioner had made it outside.  Once outside,

---

[18] Before doing do, Petitioner said this:

I'd like to say to the members that are here of [the victim's] family that I did not in—in any way—in any intentions—I did not go to that store—and I didn't plan to kill him or I didn't even plan to shoot him.  There's nothing that—that I can say that's going to change anything that's I happened, and I realize that.  And I grieve about this daily.  I really—I really do, because there's—there's nothing that—I realize that there's been a lot—lot of evidence that's been produced and that the prosecutor is trying to paint a picture and to—I just remorselessly . . . went in and intentionally killed him.  But that was not what happened in no way, form or fashion.  And I do want to extend my deepest sympathies to you about the occurrence.

Petitioner and the victim continued shooting at each other. Petitioner said he didn't shoot the victim inside the store; he was hit after chasing Petitioner outside.[19] Petitioner wrapped up the direct examination by saying he did not intend to kill the victim. He only intended to rob the store.

On cross examination, Petitioner stuck to his story about what happened in the shop—he never admitted that he fired two shots inside the shop, one at the employee who was lying behind the counter, and one at the victim, with the pistol just 15 to 18 inches from the victim's chest.

Petitioner also stuck to his version of what happened during the robbery in Washington, D.C. That is, Petitioner said he did not have the shotgun with him when he robbed the victim. He acknowledged the plea agreement—where he admitted to putting a loaded shotgun to the victim's back—but said he was willing to admit facts that didn't happen because of the plea deal. This concluded Petitioner's testimony.

---

[19] In disputing the State's position that he shot the victim at close range—that the muzzle of his pistol was only 15 to 18 inches from the victim's chest—Petitioner was actually taking issue with the opinion of the State's expert witness. It was undisputed that the pistol Petitioner used to shoot the victim contained six bullet casings, showing that six shots had been fired. It was also undisputed that at the moment the victim was shot, he was wearing a long-sleeved plaid shirt and a white undershirt. Each had a bullet hole in the chest area. The expert testified that she found "scattered particles of gunpowder, unburnt gunpowder around the gunshot hole. "There were scattered particles of gunpowder in a fairly dense pattern around the gunshot hole of entry." "Based on [her] actual testing and test firing the weapon at varying distances, [she] was able to conclude that the muzzle to target distance was approximately fifteen to eighteen inches," from the tip of the barrel to the entry of the victim's chest. "[Y]ou don't see gunpowder deposited on a target after two and half to three feet."

Trial Counsel finished up by calling Caseworker Watson.  As we explained above, he created the sentencing plan that the Superior Court considered in Petitioner's robbery case.  Caseworker Watson worked with Petitioner for about a year and a half, and he said that he found Petitioner to be both personable and likeable.  He thought Petitioner "had a lot of potential."  To prepare the plan, Caseworker Watson spoke with the Thomases to better understand Petitioner's background.  He talked to them "on a very regular basis, maybe once a week."  After talking to the Thomases, Caseworker Watson "could see" "that [Petitioner] came from a good family."  Mrs. Watson, especially, gave him something to "latch onto," something he "could convince the [C]ourt was worth investing in."  He called them Petitioner's "support."

As part of his work on Petitioner's case, Caseworker Watson arranged for a clinical psychologist and an educational psychologist to evaluate Petitioner.  (We consider these reports in detail below.)

Finally, Caseworker Watson discussed his attempt to enroll Petitioner at Howard University.  He introduced Petitioner to "certain deans" at Howard, and Petitioner "impressed" them.  Caseworker Watson was unable to take the next step, though, and have Petitioner apply for admission because he "wasn't able to raise

20

enough money to insure his tuition."[20]  He concluded his testimony on direct examination with this: "[I]f we had been able to provide tuition and he could have been a student at Howard, I'm convinced that his life would have been different.  I know this."[21]

With this, the parties rested and made their closing arguments.

3.

The State argued that life without parole was inadequate given the nature of the murder.  It also noted that Petitioner attempted to pin part of the responsibility on the victim and that he showed no remorse.

The State said that Petitioner should have admitted that the murder happened just as the State's evidence showed: that is, he fired two shots intending to kill two people, both at close range.  The State compared Petitioner's version of the murder—that he shot the victim after he was out of the store, and only because the victim was shooting at him—with Petitioner's explanations of his criminal history. He cashed the U.S. Treasury check "because some of his friends talked him into it."  He didn't really put a shotgun to his victim's back during the robbery in Washington, D.C.  He missed curfew at the halfway house "because the taxi cab

---

[20] Caseworker Watson was "circumventing the regular routine" with these efforts. Petitioner's possible admission to Howard University "was off the record, it had nothing to do with the rehabilitation plan."  Caseworker Watson "felt an allegiance to [Marie Thomas] and some responsibility, and [he] gave it [his] best effort, and [he] saw [Petitioner] do likewise."

[21] Petitioner conceded that he was on "the run" while Casework Watson was exploring the possibility that he enroll at Howard.

driver was late."  Petitioner's troubles were always someone else's fault, according to the State.  Turning to the lack-of-remorse argument, the State claimed that Petitioner was not sorry for what he did; it said he would "brag" about the murder in prison.

Trial Counsel argued for a life sentence without parole.  He claimed that Petitioner would not kill again if he were sentenced to life without parole.  Turning to the murder itself, Trial Counsel argued that the murder happened just as Petitioner said it did.  That is, Petitioner entered the bait shop with no intention of killing anyone.  Trial Counsel argued that Petitioner was remorseful and was reminded of what he did every day.  He also tried to humanize Petitioner, calling the Thomases "a good strong family" that taught him right and raised him well. He said Petitioner's tragic mistake was moving in with his dysfunctional mother in Washington, D.C.

The jury recommended the death penalty, and the Court sentenced Petitioner to death.

## II.

Petitioner appealed to the Supreme Court of Georgia and raised one argument that's relevant here: he said the trial court—by allowing the jury to see him in shackles—denied his rights to due process, equal protection, a fair trial, and a reliable determination of punishment under the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the U.S. Constitution. Although Petitioner wore shackles during both phases of the trial, the Supreme Court of Georgia held that the jury did not see them during the guilt-innocence phase. *Whatley*, 509 S.E.2d at 52.

The Court implied that the jury did in fact see the shackles during the penalty phase, but it rejected the claim under the invited error doctrine. *See id.* Indeed, it was the State that raised the shackles issue before the penalty phase, and Trial Counsel said, "[w]ell, he's convicted now" and allowed Petitioner to take the stand in front of the jury. *Id.* (alteration in original). The Court said, "A party cannot during the trial ignore what he thinks to be an injustice, take his chance on a favorable verdict, and complain later." *Id.* (quoting *Dennard v. State*, 435 S.E.2d 26, 29 (Ga. 1993)).

The Court affirmed Whatley's convictions and death sentence, *see id.* at 53, and the Supreme Court of the United States denied certiorari review, *Whatley v. Georgia*, 526 U.S. 1101, 119 S. Ct. 1582 (mem.), *reh'g denied*, 527 U.S. 1016, 119 S. Ct. 2361 (1999) (mem.).

## III.

Petitioner filed a petition for writ of habeas corpus in the Superior Court of Butts County. *Whatley v. Schofield*, No. 99-V-550 (Ga. Super. Ct.). Petitioner claimed that Trial Counsel provided ineffective assistance (1) by failing to investigate and present mitigating evidence about his background and mental

23

health (the "Mitigation Claim") and (2) by not objecting to Petitioner's appearing before the jury in shackles during the penalty phase (the "Shackles Claim"). By this time, Trial Counsel had died, so the State Habeas Court did not have the benefit of his testimony in deciding whether he provided ineffective assistance under *Strickland*.

We address each claim separately.

### A.

The State Habeas Court considered many sources of evidence in deciding the Mitigation claim: the pleadings the State filed while prosecuting the case; the trial transcript; Trial Counsel's hand-written notes that he kept in his case file; Trial Counsel's timesheet entries (which reflected the work he did); the testimony of Trial Counsel's investigator, Dewey Yarbrough ("Investigator Yarbrough"); the testimony of others whom Trial Counsel contacted before and during the trial; and the evidence Petitioner's habeas counsel presented.

The Court held an evidentiary hearing on the Mitigation Claim. We consider Petitioner's evidence first and then take up the State's response.

### 1.

24

We group the evidence Petitioner presented to the State Habeas Court into three categories: (1) five reports stemming from the YCA Study,[22] which the Superior Court ordered after Petitioner pled guilty in the robbery case—we refer to these collectively as the "1988 Reports"; (2) affidavits about Petitioner's childhood, from people familiar with his family situation growing up; and (3) affidavits related to Petitioner's mental health—one from a clinical psychologist, Dr. Lisak, and another from a psychiatrist, Dr. Dudley.

Although we group the evidence into three categories, there are two common threads running through each category: Petitioner's troubled childhood and his mental health. Those threads are the bedrock of Petitioner's Mitigation Claim, so that's where we focus our attention.

a.[23]

---

[22] Four of these reports were part of the study itself, and they were completed by the D.C. Department of Corrections: (1) "Psychological Evaluation," dated May 26, 1988; (2) "Classification Study," dated May 31, 1988; (3) "Vocational and Educational Evaluation," dated June 1, 1988; and (4) "Classification Committee's Findings and Conclusions," dated June 3, 1988. The Psychological Evaluation was performed by Dr. Kathleen Shaw, a psychologist.

The fifth report was not performed by the D.C. Department of Corrections, but it was still related to the YCA Study in that Caseworker Watson arranged the evaluation. The report is titled "Neuropsychological Evaluation" and is dated August 18, 1988. It was performed by Dr. Sarah Elpern, a clinical psychologist.

[23] There was some dispute before the State Habeas Court over whether Trial Counsel ever saw the 1988 Reports. Petitioner argued that Trial Counsel never saw the Reports and never learned the information they contained. To support his argument, Petitioner submitted an affidavit from Caseworker Watson. There, Watson said that he came to Georgia to testify during the penalty phase of Petitioner's trial. Watson claimed that Trial Counsel never asked to see his "file on the case," which included the 1988 Reports. He would have made the documents available to Trial Counsel if he had asked for them. Caseworker Watson spent two hours with

25

The 1988 Reports note that Petitioner's mother neglected her parental duties, and he was raised by his great-aunt and great-uncle. One report says that his great-uncle "provided an excellent role model" for Petitioner "during his formative years." Another one claims that Petitioner "reported a good relationship with his great aunt and uncle." The report also says that Petitioner had "a stable upbringing in his early years," but Petitioner did note "that his great uncle drank regularly and gave him beer" at a young age. Petitioner reported that he began using marijuana at age 15; he also used cocaine in high school.

---

Trial Counsel the night before the penalty phase, but he said they spent less than half an hour talking about his testimony. Finally, Caseworker Watson said that Trial Counsel never told him what questions he was going to ask, and Trial Counsel never told him what to focus on during his testimony.

In response, the State introduced the deposition of Investigator Yarbrough. Investigator Yarbrough remembered having Petitioner sign a release to get his "records." Investigator Yarbrough then asked Caseworker Watson to bring Petitioner's "psychological records" with him when he came to testify during the penalty phase. He "was sure" that Caseworker Watson brought the documents with him to Georgia. He didn't recall whether he personally saw the documents, but he noted that Caseworker Watson arrived in town with "a bag and a briefcase." Finally, Investigator Yarbrough said it was "possible" that Trial Counsel saw the psychological documents, even if he didn't.

The State Habeas Court found that Trial Counsel "performed adequately with regard to [the 1988 Reports]," and the Supreme Court of Georgia concluded that finding was reasonable. *Whatley*, 668 S.E.2d at 661 ("The [State] [H]abeas [C]ourt's conclusion that [T]rial [C]ounsel performed adequately with regard to these reports is reasonable, as it is supported by the presumption that counsel performed adequately, by documentary evidence showing that counsel obtained a signed release from [Petitioner] and requested the materials from [Caseworker Watson], and by testimony from [Investigator Yarbrough] confirming that counsel sought the records from [Caseworker Watson].").

Because we hold that Petitioner cannot show prejudice from Trial Counsel's failure to use the 1988 Reports during the penalty phase, we need not decide whether Trial Counsel provided ineffective assistance when dealing with the Reports.

26

The 1988 Reports contain two psychological evaluations of Petitioner.  One evaluation was done by a psychologist who reported that Petitioner "has uncontrollable impulses which brings him into constant conflictual situations with others because of his naive appreciation of how one plans, executes and attains realistic goals."  The report also observed that Petitioner "feels he will be able to get away with anything because he can outsmart" others.  It described his "emotional understanding and development" as "delayed and infantile."  The report said Petitioner "is fighting against a very disturbed and painful emotional state but decompensating rapidly and escaping through drugs for relief."  It noted Petitioner's "schizophrenic symptoms" and attributed much of his hardship to a desire to be closer to his mother: "[Petitioner] is experiencing a mental health breakdown and needs intensive intervention though psychotherapy to help him address his needs before he drifts into more serious adventures in an attempt to get the attention of his mother."  The report concluded by recommending "long-term psychotherapy" and "drug therapy."

The other report was done by a clinical psychologist, and the report explains the findings of many tests that were given to Petitioner. One test[24] measured Petitioner's "current level of intellectual functioning" as being "in the Low

---

[24] The test is called the Wechsler Adult Intelligence Scale-Revised Test.

27

Average range of ability."[25]  But the report pointed out that Petitioner's "potential is at least in the upper half of the Average range . . . , if not higher."[26]  As for Petitioner's "[p]ersonality [f]unctioning," the report noted that he "appears to be experiencing considerable anxiety about his ego integrity, suggesting that the anxiety is so great at times that he comes close to being overwhelmed and losing his sense of reality."  "Although some [of] his responses indicate idiosyncrati[c] perceptions and thinking, he does not appear to have schizophrenia."  The report said that "[i]t is possible that under a great deal of emotional stress [Petitioner] could become psychotic, but such symptomology is likely to be temporary."  Petitioner's "most important need," according to the report, "is intensive psychotherapy to deal with the emotional problems that underlie his drug usage."  The report concluded with this: "Despite the complexity of [Petitioner's] problems, he has the capacity to improve his functioning and [to] become a productive member of society."

According to Petitioner, if Trial Counsel had read the 1988 Reports, he would have asked for a trial continuance so he could investigate the information in those Reports.  A more thorough investigation would have revealed a childhood that was anything but perfect.

---

[25] The report listed an IQ from 80 to 89 as the "Low Average range of ability."

[26] The report listed an IQ from 90 to 109 as the "Average range of ability."

28

b.

To show what Petitioner's childhood was really like, and what a more thorough investigation would have turned up, Petitioner presented affidavits from seven people to the State Habeas Court. Notably, three of the seven witnesses also testified during the penalty phase. We focus on the testimony of those three and summarize the testimony of the other four.

Lorraine Goodman said in her affidavit that the great-aunt and great-uncle were "overly protective" of Petitioner and "smothered him." She suggested that the Thomases did not let Petitioner play with other children and kept him isolated from the outside world. During the penalty phase of the trial, Ms. Goodman said she was unaware of Petitioner getting into any trouble while living with the Thomases. She also said they took Petitioner to church regularly, and she thought he was "a respectful young man" when he was living with the Thomases. Finally, Ms. Goodman said that she heard Petitioner testify that he had an "idyllic childhood" with the Thomases—she never suggested during the penalty phase that Petitioner did not in fact have an ideal childhood.

Janet Wyche's affidavit mirrored Ms. Goodman's; she said the Thomases were overly protective of Petitioner and "never wanted [him] to play outside with the other kids." During her testimony at the penalty phase of trial, Ms. Wyche said nothing about Petitioner's childhood or his experience living with the Thomases.

29

Cleveland Thomas, Jr., said in his affidavit that Petitioner's great-uncle "drank." He also said that he has "always believed that something traumatic happened to [Petitioner]" because Petitioner's attitude about school changed "all of a sudden" before Petitioner was a teenager. This was just something that Mr. Thomas "felt"—Petitioner never told him anything of the sort. Nor did Mr. Thomas imply that the Thomases were responsible for this supposed traumatic event. During the penalty phase of the trial, Mr. Thomas did not comment on Petitioner's childhood, other than to say that Petitioner was "nice" and "mannerable" when living with the Thomases.

The other four witnesses who submitted affidavits to the State Habeas Court did not testify during the penalty phase. They described Petitioner's childhood and painted a picture that was very different from the one Petitioner painted during his testimony at the penalty phase. We summarize their affidavits below.

Petitioner's mother[27] said that Cleveland Thomas was abusive and that he drank a lot. She claimed he yelled at Marie and choked her. She was "terrified" when she found out that Cleveland and Petitioner slept in the same bed while Petitioner was growing up. This terrified her because, in her words, Cleveland was a "child molester"; according to Petitioner's mother, Cleveland molested her when she was a child. Petitioner's mother described a time when Petitioner came to visit

---

[27] Her name is Claudette Whatley Johnson.

30

her in Washington, D.C.  During the visit, she told Petitioner two "things that he was not old enough to handle": (1) the man that Petitioner thought was his father was not actually his father and (2) Cleveland raped her when she was nine months pregnant with him.  Finally, one of her friends "forced herself on [Petitioner] and had sex with him" during that visit.

Petitioner's aunt[28] called Cleveland "a drinker, a womanizer, and a wife beater."  She said he was "a mean, abusive man."  She claimed that Marie "worked hard to make things look good from the outside," despite Cleveland's behavior.

A neighbor[29] said that she "felt sorry for" Petitioner when they were growing up because "Cleveland was a crazy drunk."  The Thomases never let Petitioner do what the other kids were doing, and this neighbor "just knew [Petitioner] was going to grow up with problems because they were so overprotective."  She said Petitioner "was not raised normally at all" because "[h]e was not allowed to play with other kids, he slept . . . with Cleveland, and he had to deal with Cleveland's drunken, violent episodes."

Another neighbor[30] from Petitioner's childhood said that the Thomases "were extremely protective of" Petitioner; they never let him play outside.  She described Petitioner's home life as "far from normal" because Cleveland drank and

---

[28] Her name is Allene Whatley.

[29] Her name is Fetilda Dukes.

[30] Her name is Cara Jackson.

31

would fight with Marie. "Cleveland was known in our neighborhood as a crazy, violent, and scary drunk," she said.

These affidavits were vital to the mental health opinions that Petitioner presented to the State Habeas Court. We now turn to those opinions.

c.

Petitioner presented affidavits from a clinical psychologist and a psychiatrist to explain how Petitioner's childhood—as described in the lay witness testimony that we just laid out above—affected Petitioner's mental health.

First, we consider Dr. David Lisak's (the clinical psychologist) affidavit.[31] Dr. Lisak was asked "to evaluate [Petitioner's] psychological development, with particular focus on the impact of any childhood abuse he may have experienced."

Dr. Lisak described Petitioner as "a child, a teenager, and eventually a young man almost torn in two by the quarreling, violent, impulsive and often intoxicated adults who were responsible for raising him." On the one hand, his great-aunt

---

[31] Dr. Lisak considered several things in forming his opinions. He interviewed Petitioner 4 times, for a total of 16 hours, in January and March of 2001. He reviewed Petitioner's school and medical records, as well as Petitioner's mother's psychiatric records. He looked at the 1988 Reports and the court-ordered pretrial evaluations that Dr. Bailey-Smith and Dr. Fahey made. Finally, he considered documents related to a lawsuit filed against Lorton Reformatory officials, as well as the affidavits of these 14 people: Claudette Whatley Johnson, Norman F. Whatley, Cleveland Thomas, Jr., Franklin White, Leila Mae Dickson, Janet Wyche, Karla Humbles, Lorraine Goodman, Fetilda Dukes, Nancy Ward, Eugene Watson, Allene Whatley, Cara Jackson, and Joseph Johnson.

Dr. Lisak's affidavit is written under eight headings: "Summary of Findings," "Family Background," "[Petitioner's] Early Childhood," "The Revelations that Shattered [Petitioner's] Childhood," "Adolescence," "Incarceration at Lorton Prison," "Release from Lorton," and "Conclusions." We summarize the relevant parts.

"tried mightily to maintain a façade of normalcy, and to provide [Petitioner] with at least the basics of a normal upbringing." On the other hand, his great-uncle—"a violent alcoholic and womanizer . . . [who] terrorized the household with his drunken rages"—"undid her efforts." Dr. Lisak said that Cleveland both "physically assaulted" and "sexually abused" Petitioner.

Petitioner "became a pawn in the bitter conflict between his . . . mother . . . and [the Thomases]." In turn, this conflict "ruptured" Petitioner's understanding of "who he was and what his family members were really like." Dr. Lisak noted Petitioner's visit to Washington, D.C., the visit where his mother told him (1) that his father wasn't who he thought he was, (2) that his great-uncle had raped her, and (3) that his great-uncle was "waging a bitter and nasty war" against her to keep her from Petitioner.[32] During the same visit, Petitioner was raped by his mother's friend.

Because of this damage, Petitioner "lived a dual existence": one part of his identity "was molded by Marie" and her "desire for normalcy, while the other part of his identity was that of "a tougher, drug-using and potentially violent youth who was adapted to life on the streets." By the time Petitioner was arrested in 1995, Dr. Lisak said, "the abuse, conflicts, rejection and abandonment that had shaped

---

[32] These are the three revelations that Dr. Lisak expanded on under the heading "The Revelations that Shattered [Petitioner's] Childhood." Dr. Lisak also discussed Petitioner's getting raped under this heading, calling it a "traumatic blow."

[Petitioner] had yielded a very fragmented personality."  Petitioner "was prone to severe dissociative episodes, a consequence of years of abuse; and he had developed unusual and at times grandiose ideas that struck mental health evaluators as far back as 1988 as being schizophrenic-like."  Dr. Lisak said "[t]he lucid [Petitioner] co-existed with these other aspects of his personality, but they remained in conflict."  Unable to "integrate these warring aspects of himself," Petitioner's decisions "were impulsive and often highly irrational."  Dr. Lisak concluded with this: "[T]here is a continuous thread connecting his family's history of violence and substance abuse to the moment when [Petitioner] was convicted of murder . . . and sentenced to death."

Next, we consider Dr. Richard Dudley's (the psychiatrist) affidavit.[33]  Dr. Dudley "performed a psychiatric evaluation of" Petitioner.  Beginning with Petitioner's family medical history, Dr. Dudley noted that "several persons" in Petitioner's mother's family had mental illnesses that can be passed down genetically.  Thus, Dr. Dudley concluded, Petitioner "was born . . . with a

---

[33] In forming his opinions, Dr. Dudley reviewed Petitioner's hospital records and school records, the 1988 Reports, the transcript of the sentencing phase, the Supreme Court of Georgia's opinion in *Whatley v. State*, 509 S.E.2d 45 (Ga. 1998), a video interview of Petitioner the day after his arrest, Dr. Elpern's report, Petitioner's mother's medical records, pleadings from Petitioner's lawsuit against Lorton Prison, and the same affidavits that Dr. Lisak reviewed.

Dr. Dudley's affidavit is written under two headings: "Summary of Family Background and Social History" and "Summary of Findings and Discussion."  In the "Summary of Family Background and Social History" section, Dr. Dudley summarized much of Dr. Lisak's affidavit. We summarize only the parts of the affidavit that are relevant to our analysis.

34

significantly increased risk for the development of similar psychiatric difficulties."[34]

In light of all this, and the abusive childhood that Dr. Lisak noted in his affidavit, Dr. Dudley concluded that Petitioner was suffering from a "mental illness . . . best described as a Psychotic Disorder NOS,[35] Depressive Disorder NOS, and Polysubstance Abuse with acute cocaine intoxication" when he committed the murder and when he was sentenced to death.[36]  The "psychotic disorder is primarily characterized by delusional thinking of the grandiose and paranoid type." As a result, Petitioner's "perceptions of himself and those around him do not reflect reality," and these delusional perceptions inform his decisions and actions.[37] To explain the substance abuse disorder, Dr. Dudley pointed to Petitioner's "long drug history" that began in his early teens.  The drug abuse "seems directly related to the abuse and trauma" Petitioner experienced during his childhood because "[t]he drugs provided a temporary respite" from these difficulties.

---

[34] Specifically, Dr. Dudley said that Petitioner had a "high risk" of developing a psychotic disorder, a mood disorder, and/or a substance abuse disorder.

[35] "NOS" means "not otherwise specified."  Doctors generally use that "when someone doesn't meet the full criteria for the diagnosis."

[36] Dr. Dudley's opinion was "to a reasonable degree of medical and scientific certainty."

[37] Dr. Dudley didn't elaborate much on Petitioner's depressive disorder.  He said this: "[Petitioner's] episodes of depression are so severe and cause such extreme impairment of his ability to function that he warrants the diagnosis of depressive disorder NOS."

Next, Dr. Dudley compared his diagnosis to the diagnosis made by Dr. Bailey-Smith and Dr. Fahey.  (As we explain below, Dr. Bailey-Smith and Dr. Fahey evaluated Petitioner before trial to see whether he was competent to stand trial and to analyze his level of responsibility.)  As Dr. Dudley put it, Dr. Bailey-Smith and Dr. Fahey diagnosed Petitioner with "personality disorder NOS with antisocial, borderline, narcissistic, and schizotypal features and rule[d] out Bipolar Disorder."  Dr. Dudley said that "[t]he constellation of symptoms [they] described . . . and used to support [their] diagnosis [was] similar to what [he] . . . identified and used to make [his] diagnosis."  But, "because the information from collateral sources about [Petitioner's] history is far more detailed now [in 2001] than it was in 1997," Dr. Dudley "believe[d] that the diagnosis . . . [he] made better fit[] the symptoms described."

Finally, Dr. Dudley considered the role that Petitioner's mental state played in the murder:

> [I]t is my opinion that [Petitioner's] mental capacity at the time of the offense may have been substantially diminished.  He suffered from delusional thinking, was depressed, was on cocaine, and the convergence of these three disorders made him prone to even further deterioration in stressful situations, such as during a robbery.  While I do not believe that he was under a delusional compulsion or could not understand right from wrong, there is a strong possibility that at the time of the offense, [Petitioner's] mental capacity was substantially diminished.

2.

36

In response, the State contested both prongs of *Strickland*. Because we decide the Mitigation Claim under the prejudice prong, we focus on that part of the State's evidence.[38] To show that Petitioner was not prejudiced by Trial Counsel's alleged deficiencies—especially those related to presenting evidence about Petitioner's mental health—the State called Dr. Bailey-Smith to testify at the evidentiary hearing before the State Habeas Court. Before delving into her testimony at the evidentiary hearing, we first explain her connection to Petitioner's case.

a.

---

[38] On the first prong, the State argued that Trial Counsel did not provide ineffective assistance (1) by failing to uncover—before trial—evidence that Petitioner was abused as a child, as revealed by the lay witness affidavits, or (2) by failing to hire expert witnesses—such as Dr. Lisak and Dr. Dudley—to explain whether this new information about Petitioner's childhood would have affected his mental health at the time he committed the murder. To support its argument, the State relied on Investigator Yarbrough's testimony.

Investigator Yarbrough said that he met with Petitioner at least 16 times between Petitioner's arrest and trial. He asked Petitioner several times to describe his background, where he had grown up, and what he had experienced. Investigator Yarbrough did not recall Petitioner ever mentioning that he was sexually abused as a child. Had he, Investigator Yarbrough would have told Trial Counsel and pursued the matter. Investigator Yarbrough also believed that Trial Counsel would have presented evidence showing that Petitioner was abused as a child, if there had been any credible evidence of abuse.

Investigator Yarbrough contacted Petitioner's mother, but she wasn't cooperative. During their meetings, Petitioner provided Investigator Yarbrough with the names of potential witnesses and where they could be contacted. Yarbrough got the names of other potential witnesses while interviewing the ones Petitioner identified. In time, with Petitioner's help, Investigator Yarbrough and Trial Counsel compiled a witness list. Together, they reviewed it, struck some names, and added others. Investigator Yarbrough interviewed all whose names were listed and reported what he learned to Trial Counsel. Trial Counsel interviewed several on the list himself, including those he called to testify in the sentencing phase of the trial.

37

Dr. Bailey Smith and Dr. Fahey examined Petitioner in December of 1996.

The judge, who would preside over Petitioner's murder trial, asked the doctors to

assess (1) whether Petitioner was competent to stand trial and (2) Petitioner's

degree of criminal responsibility at the time of the murder.[39]

The doctors found that Petitioner was "in touch with reality" and concluded

"that intelligence was not a significant issue in th[e] case."  But they still decided

to test Petitioner's intelligence to gauge "current functioning."[40]  The test showed

that Petitioner was "functioning in the Average range of intellectual abilities."

Next, the doctors gave Petitioner two personality tests.[41]  His answers to one test

were suggestive of someone "with significant psychopathology."  People with

profiles like Petitioner's "generally appear boastful and egocentric"; while they

might "exaggerate their self-worth, their self-concept is actually quite poor."  They

noted that people with this type of profile may daydream and fantasize in response

---

[39] They were also ordered to assess the threat that Petitioner posed to himself or the community if bail were granted.

They interviewed and tested Petitioner for eight hours on December 13 and seven hours on December 31.  To answer these questions, the doctors relied on their interviews with Petitioner; the results of the psychological tests they gave to him; a copy of the Court Order authorizing the evaluation; reports from the Georgia Bureau of Investigation and Griffin Police Department, including witness statements; verbal communication with the Spalding County Sheriff's Department personnel about Petitioner's behavior and mental status while in jail; Orders from the Superior Court; and a videotape of police investigators' questioning of Petitioner on November 28, 1995.

[40] They did so by administering the Kaufman Brief Intelligence Test.

[41] The Minnesota Multiphasic Personality Inventory-2 and the Millon Clinical Multiaxial Inventory-III.

38

to stress.  As for Petitioner, the doctors said "this appears to take the form of magical thinking. . . .  [Petitioner] thinks he is unique and special, and ordained for a special purpose.  He believes he has unique and special powers which can impact and often directly influence other's thinking and behavior, and consequently, the outcome of some situations."

Next, the doctors made a diagnosis: they ruled out bipolar disorder and diagnosed him with "Personality Disorder NOS with antisocial, borderline, narcissistic, and schizotypal features."

Finally, the doctors considered Petitioner's competency to stand trial.  They said he had "the verbal skills" to work with his lawyer and the "conceptual skills" to weigh the strengths and weaknesses of his case.  The doctors did point out that Petitioner seemed uninterested in using all his skills to help his lawyer; they said this lack of interest stemmed from his "lack of confidence in his attorney and the legal system" and from his belief that he is a "special" person.  Petitioner didn't show the level of anxiety that they expected someone is his position to show, and this was because Petitioner thought a "higher power" would "ultimately intervene," even if he were found guilty.  In turn, Petitioner did not think a death sentence was a realistic possibility, which the doctors said was problematic because he "may understand on a cognitive, but not on a motivational level, the gravity of his situation."

39

As for the second question—Petitioner's degree of criminal responsibility at the time of the murder—the doctors concluded that "[a]lthough [Petitioner] indicated that he was experiencing a high level of distress, there [was] no evidence that he was suffering from a delusional compulsion at the time of the alleged offense. [Petitioner's] behavior at the time of the alleged offense also indicate[d] he had the ability to distinguish right from wrong."

Dr. Bailey-Smith and Dr. Fahey did not have access to the 1988 Reports when they evaluated Petitioner in 1996.

b.

At the evidentiary hearing, the State used Dr. Bailey-Smith's testimony to rebut the 1988 Reports and the affidavits from Dr. Lisak and Dr. Dudley.

First, the State showed Dr. Bailey-Smith the 1988 Reports and asked whether they caused her to "change any of [her] conclusions" about Petitioner. She answered no and said she did not "think the results [of her evaluations and testing] would have been any different."

Next, the State showed Dr. Bailey-Smith the affidavits from Dr. Lisak and Dr. Dudley. The State asked whether the affidavits were "written in the typical fashion of psychological reports in the community that [Dr. Bailey-Smith] [was] in." She said no and elaborated:

40

I've seen so many in this style I would have to say. They look like they were written for defense's viewpoint. They are more hypothetical, they are more creating—going back and trying to reconstruct the history and create a path of causation, this is what caused this, this is what caused this. Not what psychologists generally do when they do a psychological [report] . . . .

These look more like someone is trying to reconstruct history and describe a person's life and put it almost in a very clean box like this happened and this is what this person felt and this is what happened next. . . . [G]enerally most psychologists wouldn't feel as comfortable assigning causation based on a particular feeling . . . . I couldn't tell you why you acted the way you did yesterday with any degree of certainty. I don't think any psychologist could. We could tell you some factors that might have led to your behavior yesterday. We couldn't tell you the exact factors that caused that.

These reports concern me a little bit in that they are going back many, many years and assigning a certain feeling and then saying that feeling caused this behavior and that the psychologist writing this is not hypothesizing [and instead] . . . is certain . . . . And that's really out of our realm of scientific certainty. We can't do it that well.

The State then directed Dr. Bailey-Smith to Dr. Dudley's opinion that Petitioner's "mental illness is best described as a psychotic disorder NOS," "primarily characterized by delusional thinking of the grandiose and paranoid type." The State asked Dr. Bailey-Smith whether she saw "any evidence that [Petitioner] had delusional thinking or fixed delusions at the time of the crime or during [her] evaluation." She said she and Dr. Fahey did think that Petitioner had some thought patterns that "were different and bordered delusional thinking" during their evaluations, but the doctors did not think Petitioner had any actual "delusional thoughts . . . during the time of the crime or during [the] evaluation." Dr. Bailey-Smith agreed that Petitioner had no "fixed delusions" and said they "did

41

not think it went to the level that he was not in touch with reality or didn't know it was real."  Instead, "It was more some odd thought patterns, but [they] never thought [Petitioner] was delusional when [they] talked to him.  He was very coherent and very logical and very intelligent when [they] talked to him."

## B.

The parties did not present evidence on the Shackles Claim at the evidentiary hearing.  Instead, the State Habeas Court relied on the transcript of the penalty phase.[42]  Petitioner argued that Trial Counsel was ineffective for failing to object to the shackling and, as a result, he was prejudiced during the penalty phase. He also said the Supreme Court's decision in *Deck v. Missouri*, 544 U.S. 622, 125 S. Ct. 2007 (2005), "strongly supports [his] position."  He claimed that—because shackling is inherently prejudicial—"by definition" he was prejudiced due to Trial Counsel's failure to object.

The State argued that Petitioner was not prejudiced.  It pointed to the jury's short deliberation before recommending death (90 minutes) and the overwhelming evidence at trial.  It also argued that *Deck*, which was decided several years after Petitioner's trial, did not apply.

## C.

---

[42] During the guilt-innocence phase of the trial, the jurors were unaware that Whatley was wearing shackles.

The State Habeas Court denied relief. *Whatley*, slip op. at 63. It held that

Petitioner could not show prejudice on any of his three claims of ineffective

assistance of counsel. First, the Court held that Petitioner was not prejudiced by

Trial Counsel's failure to discover evidence of abuse that he allegedly experienced

as a child. *Id.* at 48–49. It noted that the lay witness "affidavit testimony . . . was

either cumulative . . . , of questionable mitigating value, biased in contradiction of

the mitigation strategy . . . at trial . . . or of other testimony presented . . . at [the

evidentiary] hearing or . . . during the [penalty] phase, or [was] speculative."[43] *Id.*

at 49.

Second, the Court held that Petitioner was not prejudiced by Trial Counsel's

failure to examine the 1988 Reports or by his failure to ask Caseworker Watson

what the Reports revealed. *Id.* at 35. The Court found, "as a matter of fact," that

the 1988 Reports "contained information that was just as potentially harmful to

Petitioner's case as it was potentially helpful." *Id.* For example, one report said

that Petitioner showed no remorse for the robbery crime and instead showed only

embarrassment for not acting smarter than he did. *Id.* The Court also discounted

the report that said Petitioner was "experiencing a mental breakdown" and needed

intense psychotherapy. *Id.* It did so because that report's author didn't actually

---

[43] The Court also found that Trial Counsel was not deficient in failing to discover this evidence because Petitioner did not inform Trial Counsel or Investigator Yarbrough about the evidence and because it was not mentioned in Petitioner's earlier psychological reports. *Id.* at 47–48.

diagnose Petitioner with a psychological disorder and because the report noted that Petitioner thought he could get away with anything because he could outsmart others. *Id.*

Third, the Court held that Petitioner was not prejudiced by Trial Counsel's failure to hire a mental health expert who would echo Dr. Lisak's and Dr. Dudley's testimony that Petitioner was suffering from a major mental illness at the time of the murder. *Id.* at 49. The Court found that most of Dr. Lisak's and Dr. Dudley's conclusions were "speculative, at best." *Id.* And "their finding, some years later, that 'Petitioner was delusional and out of touch with reality at the time of his crimes' upon which their ultimate findings were largely based was refuted by Dr. Bailey-Smith's testimony." *Id.*

Finally, the State Habeas Court found that Petitioner was not prejudiced by Trial Counsel's failure to object to his wearing visible shackles during the penalty phase. *See id.* at 21. The Court pointed out that the jury had already convicted him of malice murder (without knowing that he was wearing shackles), and the jury was aware of his escapee status. *Id.*

IV.

Petitioner appealed the State Habeas Court's denial of relief to the Supreme Court of Georgia.[44]

On the Mitigation Claim, Petitioner argued that Trial Counsel failed to investigate and present a mitigation strategy. Petitioner specifically mentioned Caseworker Watson, and he argued that Trial Counsel failed to even look at Watson's file. Had he looked, Trial Counsel would have discovered the information about Petitioner's family and the prior mental evaluations, all of which was presented to the State Habeas Court. Petitioner argued that he was prejudiced by this lackluster investigation during the penalty phase. Rather than presenting Petitioner as someone who came from a "good strong family," Trial Counsel would have told the jury about the abuse Petitioner suffered as a child and the mental problems Petitioner had, if only Trial Counsel had done a reasonable investigation. That type of testimony, according to Petitioner, would have convinced one juror to spare his life.

As we explain in more detail below, the Supreme Court of Georgia assumed Trial Counsel performed deficiently and considered all of the mitigating evidence that Petitioner presented. *See Whatley v. Terry*, 668 S.E.2d 651, 659–63 (Ga. 2008). It then weighed the mitigating evidence against all of the evidence that

---

[44] Petitioner filed an application for a certificate of probable cause to appeal, and the Supreme Court of Georgia granted it. *Whatley v. Terry*, 668 S.E.2d 651, 653 (Ga. 2008).

45

would be presented if the penalty phase were retried. *See id.* It held that Petitioner was not prejudiced by Trial Counsel's deficient performance. *Id.* at 659.

Moving to the Shackles Claim, Petitioner argued that Trial Counsel provided ineffective assistance of counsel by not objecting to his shackles. The Court again assumed that Trial Counsel performed deficiently and held that Petitioner did not show *Strickland* prejudice. *See id.* at 663.

Petitioner appealed to the Supreme Court of the United States, but it denied his petition for writ of certiorari. *Whatley v. Terry*, 556 U.S. 1248, 129 S. Ct. 2409 (2009) (mem.).

## V.

Petitioner filed a petition for a writ of habeas corpus in the District Court. The petition raised several claims, including the Mitigation Claim and the Shackles Claim now before us. The Court granted relief on the Mitigation Claim. *Whatley v. Upton*, No. 3:09-CV-0074-WSD, 2013 WL 1431649, at *34 (N.D. Ga. Apr. 9, 2013). It explained that even though Trial Counsel knew Petitioner had "prior psychological evaluations" and "a troubled upbringing," Trial Counsel "chose not to pursue" this information. *Id.* at *26. Thus, according to the District Court, Trial Counsel did not reasonably investigate Petitioner's "background and mental and psychological health," *id.*, and Trial Counsel's deficient investigation prejudiced Petitioner during the penalty phase, *id.* at *34.

46

The District Court denied relief on the Shackles Claim. *Id.* at \*39. It found

that Trial Counsel "could have had a number of valid reasons for declining to

object to his client being seen in restraints during the penalty phase." *Id.* at \*38.

Thus, the District Court found that Trial Counsel was not ineffective. *Id.*

Alternatively, the Court found that even if Trial Counsel were ineffective,

Petitioner was not prejudiced. *Id.* at \*39.

## VI.

The State appeals the District Court's decision granting the writ on the

Mitigation Claim. Petitioner cross-appeals the Court's decision denying his

Shackles Claim. We set out the standard of review and then consider each claim

separately.

## A.

Our review is constrained by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"):

> Under AEDPA, a federal court may not grant a habeas corpus
> application with respect to any claim that was adjudicated on the
> merits in State court proceedings, 28 U.S.C. § 2254(d), unless the
> state court's decision was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States, § 2254(d)(1).

*Johnson v. Upton*, 615 F.3d 1318, 1329 (11th Cir. 2010) (quoting *Berghuis v.*

*Thompkins*, 560 U.S. 370, 380, 130 S. Ct. 2250, 2259 (2010)).

47

Here, we apply AEDPA and ask (1) whether the Supreme Court of Georgia's decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined" in *Strickland*, *see* 28 U.S.C. § 2254(d)(1), or (2) whether the Supreme Court of Georgia's decisions were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," *id.* § 2254(d)(2).

In answering these questions, we keep two points in mind.  First, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)).  Second, we "presume[]" that the state court's findings of fact are correct. 28 U.S.C. § 2254(e)(1).  So, if Petitioner challenges state court rulings that rest on findings of fact, he must overcome two hurdles.  One, he must rebut the presumption of correctness that attaches to findings of fact, and he must do so with "clear and convincing evidence."  *Id.*  Two, he must overcome the deference that we give to the state court's legal decision under § 2254(d).

To succeed on an ineffective assistance claim under *Strickland*, Petitioner must show (1) that his trial "counsel's performance was deficient" and (2) that it "prejudiced [his] defense."  466 U.S. at 687, 104 S. Ct. at 2064.

48

Petitioner satisfies the second element only if he shows there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694, 104 S. Ct. at 2068. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Richter*, 562 U.S. at 104, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 693, 104 S. Ct. at 2067).  Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Id.*, 131 S. Ct. at 787–88 (quoting *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064).

## B.

With these principles in hand, we consider each claim separately.

## 1.

First, we address the State's appeal of the District Court's decision granting habeas relief on the Mitigation Claim.  The District Court refused to defer to the Supreme Court of Georgia's decision—which it resolved under *Strickland*'s prejudice prong—on the Mitigation Claim.  *Whatley*, 2013 WL 1431649, at *34. To decide whether the District Court erred, we begin with the exact version of the

claim that Petitioner presented—in his briefing—to the Supreme Court of

Georgia.[45]

In his brief to the Supreme Court of Georgia, Petitioner criticized the way

Trial Counsel portrayed his childhood: "At trial, [Trial] [C]ounsel told the jury in

closing argument that [Petitioner] came from a 'good strong family.'"  "Had

counsel done a reasonable investigation, he would have learned that just the

opposite was true."  "[H]ad [Trial] [C]ounsel done a basic investigation, he would

have been able to present a compelling life history of [Petitioner], much like the

one presented in Dr. Lisak's affidavit."  That is, "[t]he jury would have heard

powerful testimony about a childhood filled with physical, psychological, and

sexual abuse."  The jury would have heard about Petitioner's "mental problems

and learned how they developed."  "For example, the jury did not hear that

[Petitioner's] mother was raped by her uncle [who raised Petitioner] when she was

nine months pregnant with [Petitioner]."  Petitioner's mother then "left him to be

raised by the rapist uncle and his wife.  The uncle was such a violent alcoholic that

when [Petitioner] was growing up, his aunt would keep hammers by the doors of

her house so . . . she could fight off her husband's violent attacks during his

---

[45] We do so because Petitioner brought several claims for ineffective assistance of counsel before the State Habeas Court.  The State Habeas Court listed the claims based on their numbers.  *See, e.g.*, *Whatley*, slip op. at 32.  But the Supreme Court of Georgia considered Petitioner's claims of ineffective assistance of counsel by subject matter, not by claim number. Thus, we also consider the claims by subject matter.

50

drunken rages." According to Petitioner, "This is the type of testimony which could have convinced one juror to vote for life."

The Supreme Court of Georgia assumed that Trial Counsel "performed deficiently," but it held that Petitioner failed to show *Strickland* prejudice: "the absence of those professional deficiencies would not in reasonable probability have resulted in a different outcome in either phase of [Petitioner's] trial." *Whatley*, 668 S.E.2d at 659.

The Supreme Court of the United States has told reviewing courts how to decide *Strickland* prejudice in cases like this, cases where a petitioner alleges that his lawyer was deficient in failing to present mitigating evidence. The Supreme Court has said that "*Strickland*'s point [is] that the reviewing court must consider all the evidence—the good *and the bad*—when evaluating prejudice." *Wong v. Belmontes*, 558 U.S. 15, 26, 130 S. Ct. 383, 390 (2009) (per curiam) (emphasis added) (citing *Strickland*, 466 U.S. at 695–96, 700, 104 S. Ct. at 2068–69, 2071); *see also id.* at 22, 130 S. Ct. at 387–88 (noting that the habeas petitioner could not show prejudice, in part, because "aspects of [petitioner's mitigating] character [evidence] . . . would have triggered admission of . . . powerful . . . evidence in rebuttal").

So, reviewing courts must consider (1) evidence from the original guilt-innocence phase, (2) evidence from the original penalty phase, (3) evidence the

51

petitioner presented to the state habeas court, and (4) evidence the state presented to the state habeas court. When deciding what evidence the state would present in response, reviewing courts must consider whether the proffered mitigating evidence would "open[] the door" to other aggravating evidence. *See id.* at 18, 130 S. Ct. at 385. The bottom line is that in weighing all of the evidence, reviewing courts must anticipate what a retrial of the penalty phase would look like.

Here, the Supreme Court of Georgia did just that.[46] *See Whatley*, 668 S.E.2d at 659–63. Although it did not explicitly walk through the entire penalty phase— the State's case, Petitioner's case, and the State's rebuttal—it did enough to show that it weighed Petitioner's new evidence against all of the evidence, including any aggravating evidence the new evidence would bring in. After all, under AEDPA, we're most concerned with the reviewing court's "ultimate conclusion," not the quality of its written opinion. *See Gill v. Mecusker*, 633 F.3d 1272, 1290–91 (11th Cir. 2011); *see also Richter*, 562 U.S. at 98, 131 S. Ct. at 784 (noting that a state court does not have to give "a statement of reasons" for its decision).[47]

---

[46] The State Habeas Court did as well. *See Whatley*, slip op. at 35, 48–49.

[47] We think the Supreme Court of Georgia made three assumptions in reweighing the evidence. First, it assumed the State would rely on the evidence it presented in the initial penalty phase. Second, it assumed Petitioner would abandon the strategy that Trial Counsel used at the initial penalty phase and would instead rely on the evidence he proffered to the State Habeas Court. Third, it assumed the State would counter Petitioner's case in rebuttal by cross-examining Petitioner's witnesses and by introducing additional aggravating evidence.

The Supreme Court of Georgia began the reweighing process by discounting the affidavits—especially those from Dr. Lisak and Dr. Dudley—that Petitioner presented to the State Habeas Court: it "note[d] that much of [his] arguments rely upon the description and interpretation of his background in the affidavit testimony" from Dr. Lisak and Dr. Dudley. *Whatley*, 668 S.E.2d at 659. The Court acknowledged that experts may rely on "statements of others" in forming their expert opinions. *Id.* But, the Court said, "[T]hose opinions should be given weight only to the extent that the statements upon which they rely are themselves found to have been proven reliable."[48] *Id.* So, in deciding whether a jury "would have been swayed" by the additional testimony from Dr. Lisak and Dr. Dudley, the Court "d[id] not assume the correctness of the facts alleged in the experts' affidavits [and] instead . . . consider[ed] the experts' testimony in light of the *weaker* affidavit testimony upon which that testimony, in part, relied." *Id.* (emphasis added) (footnote omitted). With that, the Court "g[ave] significant weight to the [State] [H]abeas [C]ourt's finding that [Petitioner's] new experts' affidavits were 'of questionable credibility and value.'" *Id.*

There are at least two findings of fact embedded in the Court's decision to discount the experts' affidavits. First, the Court found that the facts alleged in the affidavits were not reliable. We know this because the Court did not assume the

---

[48] As the Court pointed out, "An expert witness must not be permitted to serve merely as a conduit for hearsay." *Id.*

facts were correct; in other words, the facts were not "proven reliable."  Second,

the Court found that the expert opinions themselves were not credible because they

were based, in part, on unreliable facts.  These credibility-based determinations are

findings of fact, *see Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1310 (11th

Cir. 2012) (labeling the state court's credibility finding a "factual finding" that is

presumed correct on federal habeas review), therefore we presume they are correct,

*see* 28 U.S.C. § 2254(e)(1).[49]

Although Georgia trial courts have broad discretion to admit mitigating

evidence during the penalty phase of a capital case, "the hearsay rule is not

suspended."  *Pace v. State*, 524 S.E.2d 490, 505 (Ga. 1999).  Hearsay may be

admitted, however, if the defendant demonstrates that "the potentially mitigating

influence of the testimony" would outweigh "the harm" "the violation of the rule"

would cause.  *Collier v. State*, 261 S.E.2d 364, 376 (Ga. 1979), *overruled on other*

*grounds by Thompson v. State*, 426 S.E.2d 895 (Ga. 1993).

This point on hearsay is relevant because Petitioner does not say whether he

would try to introduce in a penalty phase retrial the affidavits that he presented to

the State Habeas Court that paint the Thomases in a bad light.  If he introduced

them, they would have little probative value.  More on that below.

---

[49] *See also Bottoson v. Moore*, 234 F.3d 526, 535 (11th Cir. 2000) (analyzing "whether the finding of fact discounting [an expert's] opinion is entitled to the statutory presumption of correctness" and concluding that it is).

Then, the Supreme Court of Georgia continued the reweighing process and considered six pieces of evidence that Petitioner said Trial Counsel should have presented during the penalty phase. This evidence, Petitioner argued, would have propped up his mitigation defense. In considering the six pieces of evidence, the Court analyzed how mitigating each piece would be in a hypothetical retrial. Many of the Court's conclusions on mitigation flowed naturally from the State Habeas Court's findings of fact. Although the Court didn't always explicitly cite these factual findings, we still presume they are correct under § 2254(e)(1). As the Court itself pointed out, it accepted the State Habeas Court's findings of fact unless they were clearly erroneous. *Whatley*, 668 S.E.2d at 659. Plus, our review is not limited to the reasons the Court gave in its analysis. *See Gill*, 633 F.3d at 1291–92. So, we presume the State Habeas Court's relevant findings of fact are correct, and we flag them below.

First, Petitioner argued that evidence showing his great-uncle raped his mother would have been mitigating. *Whatley*, 668 S.E.2d at 660. The Court found that this evidence "would not have been significantly mitigating[ because it] may have offended the jurors if they perceived counsel as attacking the one couple who, while they were still living, had taken care of [Petitioner]." *Id.* This is a natural conclusion to draw from one of the State Habeas Court's critical findings of fact. The State Habeas Court found that the affidavit testimony Petitioner presented was

55

"biased in contradiction of the mitigation strategy employed by [Trial Counsel] at trial or . . . during the sentencing phase." *Whatley*, slip op. at 49 (order denying habeas relief). During both the guilt and penalty phases, Petitioner painted a positive picture of his great-aunt and great-uncle, the couple who took him in, raised him, and gave him an ideal childhood. Evidence that Petitioner's great-uncle raped Petitioner's mother no doubt conflicts with the mitigation strategy, and we presume the State Habeas Court's finding—including its finding that the affidavit evidence was biased—is correct.

Second, Petitioner argued that evidence showing that he was subjected to "brutal treatment" at Lorton Prison would have been mitigating because it would have showed why he never returned to the D.C. halfway house. *Whatley*, 668 S.E.2d at 660. The Court disagreed—"the jury would not have been significantly swayed by an argument that [Petitioner's] fear of returning to prison justified his escape from the halfway house." *Id.* at 660–61. Implicit in this statement is a finding that Petitioner's self-serving argument is not credible, and we presume that finding is correct. *Hannon v. Sec'y, Dep't of Corr.*, 562 F.3d 1146, 1150 (11th Cir. 2009) (noting that the presumption of correctness "applies to fact findings made by both state trial courts and state appellate courts").

Third, Petitioner argued that the 1988 Reports would have been mitigating because they showed that his mother neglected him and that he had mental health

problems. *See Whatley*, 668 S.E.2d at 661. But as the Court explained, the Reports also would have cut against Petitioner's mitigation case: "[the Reports] contain material that would have been damaging to [Petitioner's] mitigation case, including statements that he lacked remorse for his crimes and believed he could 'get away with anything.'" *Id.* This finding mirrored the State Habeas Court's; it found "as a matter of fact" that the Reports contained just as much potentially harmful information as potentially helpful information. *Whatley*, slip op. at 35 (order denying habeas relief). We presume this finding is correct. The Supreme Court of Georgia also noted that the Reports' findings about Petitioner's mental health were "tentative," and they would have had "little effect" because "no clear findings of mental illness were noted in another mental health examination performed in preparation for [Petitioner's] murder trial."[50] *Whatley*, 668 S.E.2d at 661.

Fourth, Petitioner argued that additional testimony[51] "from his friends and . . . jail guards" about his alleged remorse would have been mitigating. *Id.* at 661–62. Rightly anticipating the State's rebuttal—the "bad"—the Court concluded this evidence "would not have had a significant impact on the jury, particularly because the [State] would have been able to explain [Petitioner's] emotional reaction to

---

[50] The Court presumably was referencing Dr. Bailey-Smith and Dr. Fahey's reports.

[51] "Trial counsel presented testimony from [Petitioner] himself suggesting that he was remorseful." *Id.*

57

learning that the victim had died as being a concern for his own punishment rather than true remorse for his actions." *Id.* at 662.

Fifth, Petitioner argued that Trial Counsel should have given Dr. Bailey-Smith the 1988 Reports that were prepared as part of the YRA Study. *Id.* Petitioner seemed to think Dr. Bailey-Smith's report would have been more favorable if she had seen the Reports. But as the Court concluded, Dr. Bailey-Smith's testimony defeated that argument. She testified "that [the 1988 Reports] would not have changed her expert opinions if she had seen them pre-trial and, therefore, [Trial Counsel's] use of her report would not have been affected by his alleged failure to obtain the [1988 Records] either in a timely fashion or at all." *Id.* Thus, any argument that Dr. Bailey-Smith's report would have been more favorable if she had seen the 1988 Reports conflicts with Dr. Bailey-Smith's own testimony. The Court resolved this conflict in Dr. Bailey-Smith's favor, and we presume this finding of fact is correct. The Court further explained, "The diagnostic impression set out in [Dr. Bailey-Smith's] report contained hints of mitigation, but overall it could have been more aggravating than mitigating."[52] *Id.*

---

[52] For example, Dr. Bailey-Smith "never concluded that [Petitioner] suffered from psychosis." *Id.* And "her report's description of the possible 'psychopathology' suggested that [Petitioner] merely had a 'boastful and egocentric' attitude and that he had a 'form of magical thinking' characterized merely by a belief that he was 'unique and special' and had 'unique and special powers' to influence others." *Id.* This was her diagnosis: "'Rule Out [i.e., there are some signs of but not enough to reach a diagnosis of] Bipolar Disorder' and 'Personality Disorder NOS [not otherwise specified] with antisocial, borderline, narcissistic, and schizotypal features.'" *Id.* (alterations in original).

Sixth, Petitioner argued that Trial Counsel should have presented the 1988 Reports to the trial court in a renewed motion for Petitioner to get his own expert. *See id.* This allegedly would have increased Petitioner's chances of prevailing on the motion. The Court held, as a matter of law, that Trial Counsel's failure to give the 1988 Reports directly to the trial court did not prejudice Petitioner's ability to prevail on his motion for an expert. *Id.* The Court pointed out that the evaluations described in the Reports were "conducted more than eight years before Dr. Bailey-Smith's, and they reached conclusions similar to, and in some respects less favorable than, the conclusions reached in Dr. Bailey-Smith's report."[53] *Id.*

Next, we consider Petitioner's argument to the District Court. There, he said the Supreme Court of Georgia's prejudice decision is not entitled to AEDPA deference because it was an unreasonable application of the *Strickland* prejudice standard, *see* 28 U.S.C. § 2254(d)(1), and because it was based on an unreasonable determination of the facts in light of the evidence presented to the State Habeas Court,[54] *see id.* § 2254(d)(2). The decision was based on an unreasonable determination of the facts, Petitioner said, because the Supreme Court of Georgia failed to fully consider the evidence he presented to the State Habeas Court.

---

[53] "For example, although the older evaluations referred to [Petitioner] as 'evidenc[ing] symptoms of schizophrenia,' those symptoms are described in the reports as arising from [Petitioner's] use of illegal drugs." *Id.* at 662–63 (second alteration in original).

[54] In addition to the evidence the parties presented during the evidentiary hearing, the transcripts from both phases of Petitioner's trial were also before the State Habeas Court.

59

The District Court found that Trial Counsel performed deficiently.  *Whatley*, 2013 WL 1431649, at *26–27 (concluding that Trial Counsel failed to conduct an adequate investigation).  Then, instead of reviewing the Supreme Court of Georgia's analysis of *Strickland* prejudice, it conducted its own analysis.  *Id.* at *27.  That procedural error was fatal.  As the District Court itself said, it "reweigh[ed] the evidence in aggravation against the totality of available mitigating evidence, both adduced at trial and in the state habeas proceedings."  *Id.* It "f[ound] that in reweighing the evidence in aggravation against the totality of available mitigating evidence, from both the [penalty] phase at trial and from the state habeas proceedings, there is a reasonable probability that one member of the jury would have voted for life instead of death."  *Id.* at *34.

Only then, after reweighing the evidence itself, did the District Court consider the Supreme Court of Georgia's decision on prejudice.  *Id.*  But it never asked whether the Supreme Court of Georgia's decision was reasonable.  Instead, the District Court held that the Court's decision was not entitled to AEDPA deference because it disagreed with the Supreme Court of Georgia.  *See id.*  The District Court disagreed with the Court's factual findings on how the jury would perceive the new mitigation evidence, *see id.* at *33–34, so it rejected the Court's

60

ultimate conclusion: that there was no reasonable probability the mitigation evidence affected the outcome, *see id.* at *34.[55]

Now, we must review the District Court's decision. "We review *de novo* the District Court's decision about whether the state court's ruling was contrary to federal law, involved an unreasonable application of federal law, or was based on an unreasonable determination of the facts." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 844 (11th Cir. 2011) (per curiam).

We hold that the District Court erred by deciding *Strickland* prejudice—reweighing all of the evidence—*de novo*. When a district court reviews a state court's decision under AEDPA, it must first consider the claim as it was presented to the state court. Next, it considers the state court's decision. If the state court applied the correct Supreme Court precedent—here, the Supreme Court of Georgia correctly applied *Strickland*—the district court decides whether the state court applied the Supreme Court precedent unreasonably. *See* 28 U.S.C. § 2254(d)(1). The district court also considers whether the state court's decision was based on an unreasonable determination of the facts. *Id.* § 2254(d)(2). If the district court decides the state court's decision was based on an unreasonable application of

---

[55] The District Court explicitly said that that the Supreme Court of Georgia's decision on the performance prong of *Strickland* was not entitled to deference under 28 U.S.C. §§ 2254(d)(1), (2). *See id.* But it did not make the same explicit statement about the Supreme Court of Georgia's decision on the prejudice prong. Instead, it said only that Petitioner was in fact prejudiced. *See id.*

Supreme Court precedent, or if it decides the state court's decision was based on an unreasonable determination of the facts, only then can it review the claim *de novo*. *See McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009) (reviewing a petitioner's claim *de novo* after finding that the petitioner satisfied § 2254(d)).

Here, the District Court reviewed the prejudice decision *de novo* without first considering whether the Supreme Court of Georgia's findings of fact were unreasonable. Again, the Supreme Court of Georgia found that the evidence Petitioner presented to the State Habeas Court had little probative value. *See Whatley*, 668 S.E.2d at 659–63. In turn, the Court reweighed all of the evidence and found that there was no reasonable probability that the outcome of the penalty phase would have been different, even if the jury heard Petitioner's proffered evidence. *See id.* at 659. These findings were the foundation of the Supreme Court of Georgia's ultimate conclusion—that Petitioner was not prejudiced by Trial Counsel's deficient performance. With no finding that the state court's decision was based on an unreasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2), and with no basis to say that the state court unreasonably applied *Strickland*, *see* 28 U.S.C. § 2254(d)(1), the District Court should have been constrained by AEDPA.

62

On top of deciding the prejudice issue *de novo* and failing to consider the state courts' findings of fact, the District Court obviously failed to presume that these findings of fact were correct, which AEDPA requires. *See* 28 U.S.C. § 2254(e)(1). To make these findings of fact, the state courts assessed credibility and considered the reliability of the evidence that Petitioner presented to the State Habeas Court. *See Whatley*, slip op at 49 (order denying habeas relief) (noting that much of the affidavit testimony Petitioner presented was "biased" and conflicted with other evidence presented at trial). These findings of fact—and any credibility or reliability determinations that they rested on—are presumed correct. *See Mansfield*, 679 F.3d at 1310 (labeling the state court's credibility finding a "factual finding" that is presumed correct on federal habeas review). Remember, because these findings of fact were the foundation for the Supreme Court of Georgia's conclusion that Petitioner was not prejudiced, this presumption of correctness is the first hurdle that Petitioner must clear, even before getting to § 2254(d) deference.

In sum, given the District Court's procedural error, we would normally vacate its judgment granting the writ on the Mitigation Claim and remand the case to the District Court with instructions. But because we have the same cold record as the District Court had before it, we will do the proper analysis ourselves.

63

We presume the Supreme Court of Georgia's factual findings are correct, 28 U.S.C. § 2254(e)(1), so we must decide whether Petitioner has overcome that presumption. The Supreme Court of Georgia found that the affidavits from Dr. Lisak and Dr. Dudley were "of questionable credibility and value." *See Whatley*, 668 S.E.2d at 659. And it found that the six pieces of evidence Petitioner proffered would not have been mitigating. *Id.* at 660–62.

Above, we said that when a reviewing court weighs all of the evidence, it reconstructs a hypothetical retrial. And we also said that the Supreme Court of Georgia did not explicitly walk through every step of a hypothetical retrial. But it didn't have to. Indeed, we are not limited to the reasons the Court gave and instead focus on its "ultimate conclusion," *see Gill*, 633 F.3d at 1291—here, that Petitioner was not prejudiced by Trial Counsel's deficient performance. Under 28 U.S.C. § 2254(d), we must "determine what arguments or theories . . . *could* have supported . . . the state court's decision." *See Richter*, 562 U.S. at 102, 131 S. Ct. at 786 (emphasis added). Thus, we walk through some of the steps of a hypothetical retrial to show why Petitioner has not overcome the presumption of correctness that applies to the Supreme Court of Georgia's findings of fact. These steps also show that the Court's decision was not an unreasonable application of *Strickland*.

64

It's unclear whether Petitioner would try to introduce in a penalty phase retrial the affidavits that he presented to the State Habeas Court. He presented affidavits from lay witnesses and from Dr. Lisak and Dr. Dudley; they all paint the Thomases in a bad light. If Petitioner were permitted to introduce the affidavits, they would have little probative value.

We take the lay witness testimony first. The State would argue that these affidavits were little more than after-the-fact attempts to save Petitioner from the death penalty. Remember, three of the witnesses who submitted affidavits also testified during the initial penalty phase. They said nothing about Petitioner growing up in an abusive environment. In fact, Petitioner told the jury in 1997, "The household in which I was reared here in Georgia . . . was a very stationary, very unconditional as far as for loving and—and support, and ideally everything that a child could—could ask for growing up, I had with my great-aunt and great-uncle." That testimony is consistent with the 1988 Reports, which say that Petitioner reported having a good relationship with his great-aunt and great-uncle. The Reports also note that Petitioner had a stable upbringing.

So, the State would argue that Petitioner—conveniently—never revealed the alleged abuse before initiating his state habeas proceedings. That is, he didn't tell (1) the psychologists or psychiatrists who evaluated him as part of the YCA Study in 1988; (2) Caseworker Watson, who worked with him for 18 months to develop a

65

sentencing plan in the robbery case in the D.C. Superior Court; (3) Dr. Bailey-Smith and Dr. Fahey, who evaluated his competence to stand trial and his level of responsibility before trial, in December 1996; (4) Trial Counsel; or (5) Investigator Yarbrough. All these people were in Petitioner's corner, so he had no incentive to keep the alleged abuse from them. In fact, the people involved with the YCA Study were compiling information that Caseworker Watson would then rely on when crafting a proposed rehabilitation plan. Had Caseworker Watson known of the alleged abuse, the proposed plan would have been different. Petitioner must have known that.

If Petitioner presented this version of his childhood by introducing the affidavits, the State would expose it through argument. If the witnesses testified live, the State would expose the same points through cross-examination.

Presumably, Petitioner himself would take the stand and tell this new version of his childhood. Using the evidence we just explained, the State would impeach him on cross-examination, gutting his credibility. Additionally, the State would also explore the reason Petitioner gave for leaving Georgia and moving to Washington, D.C., in the fall of 1987—a longing to be with his mother. The State would refer to the 1988 Reports that quoted Petitioner as saying, "I moved to D.C. from near Atlanta in . . . 1987." It would then remind Petitioner that, at his trial in 1997, he testified that he went to Washington, D.C., because he wanted to live with

66

his mother.  After Petitioner agreed, the State would refer him to the FBI report attached to Dr. Bailey-Smith and Dr. Fahey's pretrial report.  The FBI report shows that Petitioner was arrested in Griffin, Georgia, on October 2, 1987, and charged with two counts of burglary, each committed on that date.  He was then released on bail.  The State would ask Petitioner whether the FBI report is accurate and whether he skipped bail and fled to Washington, D.C., to avoid prosecution.

Now, Dr. Lisak's and Dr. Dudley's opinions.  It wouldn't matter if Petitioner presented their opinions by introducing their affidavits or by having them testify.  The result would be the same: the State would refute their opinions with testimony from Dr. Bailey-Smith.  Before the State Habeas Court, Dr. Bailey-Smith said Dr. Lisak's and Dr. Dudley's reports "concern[ed] [her] a little bit in that they are going back many, many years and assigning a certain feeling and then saying that feeling caused this behavior and that the [author] . . . is not hypothesizing [and instead] . . . is certain."  She said "that's really out of our [psychologists'] realm of scientific certainty.  We can't do it that well."  And she noted that both reports "look like they were written for defense's viewpoint."  At a retrial, the State would call Dr. Bailey-Smith as a witness, and her testimony would seriously undermine the opinions of Dr. Lisak and Dr. Dudley.

This picture of a hypothetical retrial shows that Petitioner did not overcome with clear and convincing evidence the presumption of correctness that applies to

67

the Supreme Court of Georgia's findings of fact. *See* 28 U.S.C. § 2254(e)(1). It also shows that the Supreme Court of Georgia did not unreasonably apply *Strickland* in finding that Petitioner could not show *Strickland* prejudice. And finally, the picture supports our holding that the District Court erred by disregarding the Supreme Court of Georgia's analysis of the prejudice issue and by deciding it *de novo*.

2.

Petitioner cross-appeals the District Court's rejection of his Shackles Claim. Recall, before Petitioner took the stand during the penalty phase, the State raised the shackles issue. *Whatley*, 509 S.E.2d at 52. Trial Counsel didn't object and simply said, "Well, he's convicted now." *Id.* (alteration omitted). Petitioner then testified, which included a "physical demonstration of his version of events," with visible shackles. *Whatley*, 668 S.E.2d at 663.

On direct appeal, Petitioner raised a <u>substantive</u> shackling claim, but the Supreme Court of Georgia rejected it under the invited error doctrine. *Whatley*, 509 S.E.2d at 52. Doing so, the Court really treated the substantive shackling claim as procedurally defaulted; that is, it denied the claim because it was not raised and rejected in the trial court. Petitioner agrees that the Court treated the substantive claim as procedurally defaulted.

68

Unable to bring the procedurally defaulted substantive claim on collateral attack,[56] Petitioner brought an ineffective assistance of counsel claim instead. Before the Supreme Court of Georgia again, Petitioner argued that Trial Counsel performed deficiently by failing to object to the shackles. On *Strickland*'s prejudice prong, Petitioner argued that "because shackling is 'inherently prejudicial,' by definition, [he] was prejudiced by [Trial] [C]ounsel's failure to object." To show that shackling is "inherently prejudicial," he cited *Deck v. Missouri*, 544 U.S. 622, 125 S. Ct. 2007 (2005), and *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.) (per curiam), *opinion withdrawn in part on denial of reh'g*, 833 F.2d 250 (11th Cir. 1987). Both of these cases say that shackling a defendant without a justified state interest violates a criminal defendant's due process rights under the Fourteenth Amendment. *See Deck*, 544 U.S. at 629, 125 S. Ct. at 2012; *Elledge*, 823 F.2d at 1450–52.[57] And if certain conditions are met, these cases say that courts—on direct appeal—should presume the defendant was prejudiced by

---

[56] Under Georgia law, "a failure to make timely objection to *any* alleged [trial court] error or deficiency or to pursue the same on appeal ordinarily will preclude review by writ of habeas corpus." *Black v. Hardin*, 336 S.E.2d 754, 755 (Ga. 1985). But "an otherwise valid procedural bar will not preclude a habeas corpus court from considering alleged constitutional errors or deficiencies if there shall be a showing of adequate cause for failure to object or to pursue on appeal *and* a showing of actual prejudice to the accused." *Id.* Here, Petitioner has never argued that he can show cause and prejudice to excuse the procedural bar.

[57] The defendants in *Deck* and *Elledge* would have been unable to raise a Sixth Amendment ineffective assistance of counsel claim on collateral attack because their trial counsel objected to the shackles in both cases. *See Deck*, 544 U.S. at 625, 125 S. Ct. at 2010; *Elledge*, 823 F.2d at 1450. They appealed on the ground that the trial courts' overruling their objections violated the Fifth and Fourteenth Amendments. *See Deck*, 544 U.S. at 625–28, 125 S. Ct. at 2010–11; *Elledge*, 823 F.2d at 1442.

the unconstitutional shackling. *See Deck*, 544 U.S. at 635, 125 S. Ct. at 2015; *Elledge*, 823 F.2d at 1450–52. Petitioner concluded his argument with a hypothetical: "Had [Trial] [C]ounsel made appropriate objections . . . , [Petitioner] would have been tried without the unconstitutional prejudice of being seen in shackles or had his sentence reversed [on direct appeal] as a result of being tried while in shackles."

The Supreme Court of Georgia rejected this claim. *See Whatley*, 668 S.E.2d at 663. It noted that a presumption of prejudice would apply if Petitioner's claim were on direct appeal. *See id.* ("On direct appeal where unconstitutional shackling has occurred, there is a presumption of harm that can be overcome only upon a showing by the State that the shackling was harmless beyond a reasonable doubt."). But it refused to apply the presumption because Petitioner's shackling claim was based on ineffective assistance of counsel (not due process), and it was brought on collateral attack (not direct appeal). *See id.* ("However, where, as here, the issue is the ineffective assistance of trial counsel in failing to object to such shackling, the petitioner is entitled to relief only if he or she can show that there is a reasonable probability that the shackling affected the outcome of the trial."). That is, the Court held that Fourteenth Amendment due process cases did not apply to Petitioner's Sixth Amendment ineffective assistance claim. So, it applied

70

*Strickland*'s actual prejudice standard and held there was no reasonable probability that Trial Counsel's failure to object affected the sentence.  *See id.*

Petitioner argues that the due process cases, and the presumption of prejudice they bring with them, do apply to his ineffective assistance of counsel claim.  And he says the Supreme Court of Georgia, and the District Court in reviewing that Court's decision, erred by refusing to consider the outcome of his hypothetical direct appeal.[58]

We pause briefly to consider exactly what Petitioner is asking us to do.  He is asking us to consider what would have happened if Trial Counsel had objected.  And he is asking us to assume that the trial court botched the objection, either by overruling it without a hearing or by overruling it after holding a hearing and erroneously finding that the state met its burden under *Elledge*.  Then, Petitioner says, imagine that Trial Counsel raised the <u>substantive</u> shackling claim on direct appeal.  Of course, that could never happen in this case because the substantive shackling claim is procedurally barred.  But Petitioner pushes forward and says, finally, we should assume that the Supreme Court of Georgia applied *Elledge* and *Deck*, that it presumed prejudice, and that it vacated his sentence—all based on the procedurally defaulted substantive shackling claim.

---

[58] When we considered the Mitigation Claim, we focused on how the District Court resolved the claim.  We did so to explain why the Court erred.  Because we find no error with the District Court's decision on the Shackles Claim, and because we review the claim *de novo*, we do not focus on the District Court's decision.

71

The question before us is whether Petitioner can borrow the presumed prejudice that would apply on direct appeal—a direct appeal that would never happen because the substantive claim is procedurally defaulted—to show actual prejudice under *Strickland*. The answer is obvious. Under Georgia law, a petitioner cannot rely on the legal standard that would have applied on direct appeal (here, presumed prejudice)—if only the claim weren't procedurally defaulted—to show ineffective assistance of counsel on collateral attack (that is, actual *Strickland* prejudice).[59] Georgia case law explains this.

In *Seabolt v. Hall*, the defendant was convicted of murder after a jury trial. 737 S.E.2d 314, 315 (Ga. 2013). At the trial, a witness was allowed to testify in chambers, and only the judge and the lawyers were present. *Id.* at 316. The testimony was transmitted live to the jury through television. *Id.* The defendant's lawyer did not object on the ground that defendant had a constitutional right to confront the witness, and the defendant did not raise the issue on direct appeal. *Id.* The defendant then filed a habeas petition and argued that trial counsel was ineffective in failing to object and by failing to raise the issue on direct appeal. *Id.* "Rather than decide [the defendant's] claim as it was raised [on collateral attack], the [state] habeas court first analyzed the case as if it were a direct appeal" and applied "a presumption of prejudice." *Id.* The Supreme Court of Georgia

---

[59] At least not without arguing cause and prejudice to excuse the procedural default. Petitioner does not make that argument before us.

72

reversed.  *Id.* at 318.  Even though prejudice would have been presumed on direct appeal, the Court noted, the defendant had to show *actual* prejudice because the error was raised in the context of an ineffective assistance of counsel claim.  *See id.* at 317.  Nor did the defendant argue that she could show cause and prejudice to excuse the procedural default of the substantive claim.  *Id.* at 737.[60]

*Hall* directly controls.  Like the defendant in *Hall*, Petitioner's substantive claim is procedurally defaulted.  And like the defendant in *Hall*, Petitioner says the court hearing his collateral attack should treat the claim as though it were raised on direct appeal.  But Georgia law bars this.  Petitioner must show actual prejudice—as *Strickland* requires—to succeed on his ineffective assistance claim.  Or he must show cause and prejudice to overcome the procedural bar on the substantive claim.  He does not make this argument before us.[61]

We must respect Georgia's procedural law.  *Mincey v. Head*, 206 F.3d 1106, 1135 (11th Cir. 2000) ("It is well-settled that federal habeas courts may not consider claims that have been defaulted in state court pursuant to an adequate and

---

[60] Even outside the ineffective assistance of counsel context, the Supreme Court of Georgia has made clear that "a convicted defendant seeking to overcome a procedural bar is not entitled to the benefit of a presumption of prejudice that would otherwise apply."  *Turpin v. Todd*, 493 S.E.2d 900, 907 (Ga. 1997).  Instead, the defendant must show actual prejudice to overcome the procedural bar.  *Id.* at 908–09.

[61] Nor would his burden be any easier if he did.  To excuse procedural default, a petitioner must show *actual* prejudice, a showing that the error "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *Turpin*, 493 S.E.2d at 907 (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 1595–96 (1982)).

independent state procedural rule, unless the petitioner can show 'cause' for the default and resulting 'prejudice,' or 'a fundamental miscarriage of justice.'").  And we cannot breathe life into Petitioner's defaulted claim—tossing Georgia procedural law aside—by treating his collateral attack as a direct appeal.

Indeed, to apply a presumption of prejudice from a procedurally defaulted claim would have courts treating collateral review the same as direct review.  *See Purvis v. Crosby*, 451 F.3d 734, 743 (11th Cir. 2006) ("To hold that the presumption of prejudice applies not only when properly preserved structural [trial court] errors are raised on appeal but also when related ineffective assistance claims are raised in a collateral proceeding would diminish the difference between direct and collateral review.").  In turn, "Any defendant who could not make the prejudice showing necessary to have a defaulted claim of structural [trial court] error considered could bypass that requirement by merely dressing that claim in ineffective assistance garb and asserting that prejudice must be presumed." *Id.*  So, it's hardly surprising that Georgia procedural law prohibits a petitioner from relying on a substantive standard that would apply—*if only* the claim weren't defaulted—to then show prejudice under *Strickland*.

After all, "Consider the farce that would be created if trial counsel, in a case such as [this], could for strategic reasons agree to the challenged arrangement [here, shackles] and then, if the strategy failed, have the client's conviction set

74

aside on appeal." *Hall v. Warden*, 686 F. App'x 671, 690 (11th Cir. 2017) (Tjoflat, J., dissenting). This respect for state procedural law has no doubt driven the outcome in other cases where courts have said a petitioner cannot borrow the legal standard from one context and apply it in another. The borrowing is prohibited because it borrows from a procedurally defaulted claim. *See, e.g.*, *Premo v. Moore*, 562 U.S. 115, 129–30, 131 S. Ct. 733, 744 (2011) (noting that the state court's decision that the petitioner failed to show *Strickland* prejudice could not have been "contrary to [*Arizona v.*] *Fulminante*, [499 U.S. 279, 111 S. Ct. 1246 (1991)], for *Fulminante* says nothing about prejudice for *Strickland* purposes"); *Jones v. Secretary*, 834 F.3d 1299, 1321 (11th Cir. 2016) ("[W]hile *Deck* altered the burden of proof in a substantive shackling claim brought under the Due Process Clause, it did not affect the petitioner's burden to prove actual prejudice when raised in an ineffective assistance of counsel claim on collateral review . . . ." (citing *Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1313–14 (11th Cir. 2005))).

Put simply, Petitioner cannot borrow presumed prejudice from a hypothetical direct appeal—that would never happen because the substantive shackles claim is procedurally defaulted—and use it to show actual prejudice under

75

*Strickland*.[62]  Doing so would violate Georgia's procedural laws and, for that

matter, common sense.

So, Petitioner must show actual prejudice, as *Strickland* requires: "a

reasonable probability that, but for his trial counsel's failure to object to [the]

shackling, the result of his sentencing would have been different."  *Jones*, 834 F.3d

at 1321 (alteration in original) (quoting *Marquard*, 429 F.3d at 1313).  On top of

that, he must show that the Supreme Court of Georgia's decision on actual

prejudice is unreasonable.  He cannot.  The Supreme Court of Georgia reasonably

concluded that the shackles had little effect on the jury in this case.  The evidence

showed that Petitioner had a violent criminal history.  He robbed a man at gunpoint

and assaulted a woman in public.  He had been given many chances to turn things

around, but he never did.  As for the murder in this case, the State presented

---

[62] The Dissent faults us (and the Georgia Supreme Court) for distinguishing *Deck*.  It says that we distinguish *Deck* (and the other due process cases) because *Deck* "involved a due process challenge on direct appeal and not an ineffective assistance of counsel claim."  Dissenting Op. at 9.  But, the Dissent argues, "This distinction . . . is one without a difference."  *Id.*  Two quick points on this.  First, the Dissent correctly explains the reason we distinguished *Deck*.  But the Dissent doesn't explain the analytical point we made by distinguishing it.  We distinguished *Deck* to explain why the presumption of prejudice that comes with *Deck* does not apply in this context.  That is, we drove home the point that a presumption of prejudice that applies to a properly raised substantive claim does not apply to an ineffective assistance of counsel claim that's based on a procedurally defaulted substantive claim.  We did not distinguish *Deck* as a way of discounting the effect that shackling has on a jury.  Second, by calling the difference in procedural posture a distinction without a difference, the Dissent all but borrows presumed prejudice that would apply on direct appeal to show actual prejudice under *Strickland*.  For the reasons we've explained, the law does not allow this sort of borrowing.  The Dissent does not go so far as to say that it's borrowing the prejudice, but that's the practical effect of its analysis.  It thumbs the scale so far in favor of prejudice, based on the "inherently prejudicial effect" of shackling, *see id.* at 8–10, that it's difficult to imagine a situation when actual *Strickland* prejudice wouldn't be shown.

evidence that showed Petitioner tried to kill two people—he just happened to miss

one of them—presumably trying to leave no witnesses.  He fired both shots at

close range.  Put simply, the shackles were trivial in light of evidence before the

jury.[63]

Again, we give state court decisions "the benefit of the doubt," *Woodford v.*

*Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (per curiam), and we must

respect the state court's decision "so long as 'fairminded jurists could disagree' on

the correctness of" it.  *Richter*, 562 U.S. at 101, 131 S. Ct. at 786 (quoting

*Yarborough*, 541 U.S. at 664, 124 S. Ct. at 2149).  Petitioner has the burden of

overcoming this deferential standard, *Cullen v. Pinholster*, 563 U.S. 170, 181, 131

S. Ct. 1388, 1398 (2011), and he has not done that here.  The District Court's

decision on this claim is affirmed.

## VII.

The judgment of the District Court is

**REVERSED IN PART AND AFFIRMED IN PART.**

---

[63] We are mindful that deciding *Strickland* prejudice is a fact-intensive question.  That said, we think it is telling that the Dissent cites just two out-of-Circuit cases that (1) found *Strickland* prejudice based on shackling and (2) granted federal habeas relief based on that prejudice.  And one of those cases doesn't even mention the role the AEDPA deference plays in federal review of state habeas proceedings.

JORDAN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion with one exception, and that exception is Mr. Whatley's ineffective assistance of counsel claim related to shackling. On that claim, I respectfully dissent.

At the sentencing phase of his capital trial, Mr. Whatley was called by his counsel to testify. He stood up from the defense table and shuffled to the witness stand, revealing to the jury that he was restrained by leg shackles. The shackles had not been visible to the jury during the guilt phase of the trial because a curtain had been draped over the defense table to shield them from view. The visible shackles proved to be only the beginning of the problem.

During cross-examination, the prosecutor asked Mr. Whatley to come down into the well of the courtroom. Mr. Whatley complied, with the shackles around his ankles yanking his legs together as he moved. The prosecutor then handed Mr. Whatley a toy gun and said, "Now, this is not the type of gun you had that day. I hope you'll understand why I don't want to give you a real gun." Mr. Whatley grasped the prop as the jury looked on. The prosecutor then instructed Mr. Whatley to re-enact his crime (the fatal shooting of a store owner during an armed robbery). As the demonstration unfolded, Mr. Whatley was repeatedly told to point the gun at the prosecutor, who was simultaneously directing the scene and playing the role of the murder victim.

78

The next day, the jurors who observed this demonstration were asked to decide whether Mr. Whatley should be sentenced to death.    In his closing argument, the prosecutor—with the image of Mr. Whatley re-enacting the murder fresh in everyone's mind—harped on Mr. Whatley's future dangerousness and urged the jury to impose the death penalty.    The jury did as he requested, sentencing Mr. Whatley to death.

I part company with the majority on the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).    In my view, the Georgia Supreme Court's ruling—that the sight of Mr. Whatley re-enacting the murder while shackled was not prejudicial—constituted an unreasonable application of clearly established Supreme Court precedent.    *See* 28 U.S.C. § 2254(d)(1).

The Georgia Supreme Court erred in three critical ways.    First, it failed to conduct the prejudice inquiry with proper regard for the inherent harm that results from visible shackling.    Second, it did not take into account the fact that Mr. Whatley wore the shackles not just while walking to the witness stand, but while re-enacting the murder in front of the jury with the prosecutor playing director and victim.    And third, it failed to analyze how the shackles may have affected the jurors' views regarding Mr. Whatley's alleged propensity for future violence, one of the major themes of the prosecutor's closing argument.

79

**I**

The Supreme Court has long considered the use of visible physical restraints (like handcuffs or leg irons) on criminal defendants to be an inherently prejudicial practice. *See Deck v. Missouri*, 544 U.S. 622, 626–29 (2005); *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986); *Illinois v. Allen*, 397 U.S. 337, 343–44 (1970). Because visible restraints inevitably imply that a defendant is a dangerous person, they are justified only by a particularized and essential state interest and should only be used as "a last resort." *Allen*, 397 U.S. at 344. For decades, we have similarly viewed the risk of prejudice posed by visible restraints to be *so serious* that due process secures a defendant the right to contest their necessity. *See Elledge v. Dugger*, 823 F.2d 1439, 1451–52 (11th Cir.) (defendant restrained at sentencing phase), *opinion withdrawn in part*, 833 F.2d 250 (11th Cir. 1987); *Zygadlo v. Wainwright*, 720 F.2d 1221, 1223–24 (11th Cir. 1983) (defendant restrained at guilt phase). The Georgia Supreme Court has come to the same conclusion. *See Allen v. State*, 221 S.E.2d 405, 409 (Ga. 1975) (explaining that restraints should not be used on a criminal defendant unless the trial court determines that special circumstances warrant added security precautions).

During the guilt phase of a trial, the use of visible restraints seriously jeopardizes a defendant's right to a presumption of innocence. At the sentencing phase, capital defendants are no longer presumed innocent, but the Supreme Court

80

still recognizes that the prejudicial effect of visible restraints is substantial. *See Deck*, 544 U.S. at 633. One reason is that "the defendant's life turns on the same jury's answer to the question of *future* dangerousness." *Marquez v. Collins*, 11 F.3d 1241, 1244 (5th Cir. 1994) (emphasis in original). The use of shackles "almost inevitably implies to a jury, as a matter of common sense, that court authorities consider the offender a danger to the community . . . ." *Deck*, 544 U.S. at 633. The Supreme Court has explained, therefore, that "[t]he use of shackles can be a thumb on death's side of the scale." *Id.*

In this case, the prosecutor made Mr. Whatley's propensity for future violence a major theme in his argument for the death penalty. During closing argument, the prosecutor warned the jury that "Frederick Whatley is going to kill somebody else unless you execute him. He is going to do that just as sure as I'm standing here talking to you." This point was reiterated many times over. The jurors were told that Mr. Whatley was "dangerous," and that prison would "only make him smarter and meaner." They were twice asked to consider whether Mr. Whatley would "kill a guard if that guard [stood] between him and freedom." To make sure there were no doubts, the prosecutor answered his own rhetorical question for the jurors: "He will be a threat until the day he is executed."

81

## II

To prove ineffective assistance of counsel, a defendant must show that his counsel's performance fell below minimum professional standards, and that there is a reasonable probability that counsel's error affected the outcome of the proceeding. *See Strickland*, 466 U.S. at 688, 694. To establish a reasonable probability, Mr. Whatley does not need to show that, but for his counsel's errors, a different outcome was more likely than not. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (explaining that a defendant does not need to establish *Strickland* prejudice by a preponderance of the evidence). Instead, he need only establish "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because Georgia requires a unanimous jury to impose a death sentence, we conduct the prejudice inquiry by asking whether there is a reasonable probability that one member of the jury would have returned a life sentence rather than a death sentence. *See Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014).

The Georgia Supreme Court assumed that trial counsel's failure to object to the visible shacking was deficient performance, but it concluded that Mr. Whatley had not established prejudice under *Strickland*: "In view of the balance of the evidence presented at his trial, we conclude as a matter of law that [Mr.] Whatley cannot show that his trial counsel's failure to object to his shackling in the

82

sentencing phase in reasonable probability affected the jury's selection of a sentence." *Whatley v. Terry*, 668 S.E.2d 651, 663 (Ga. 2008).

Under 28 U.S.C. § 2254(d)(1), we must defer to the Georgia Supreme Court's decision unless it "was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." A state court decision involves an unreasonable application of federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . ." *Williams*, 529 U.S. at 407–08. I believe that the Georgia Supreme Court's conclusion regarding prejudice involved an unreasonable application of *Strickland*. I am mindful that a state court decision is not unreasonable just because a federal court would have reached a different outcome, and recognize that the § 2254(d)(1) showing is a "difficult" one. *See Harrington v. Richter*, 562 U.S. 86, 102 (2011). A state court's application of federal law must be "objectively unreasonable" to warrant habeas relief. *See Williams*, 529 U.S. at 409. But even giving the Georgia Supreme Court's prejudice determination the deference it is due under AEDPA, I believe Mr. Whatley is entitled to habeas relief.

## A

As explained above, the *Strickland* prejudice inquiry requires that we ask whether counsel's error (in reasonable probability terms) affected the outcome.

83

Because the relevant error is counsel's failure to object to the visible shackling at sentencing while Mr. Whatley re-enacted the murder, we should first ask whether the objection would have been sustained.  If a timely objection would have been properly overruled, then Mr. Whatley cannot show prejudice.

A few considerations lead me to conclude that the objection would have been sustained.  First, it was the prosecutor who expressed a concern about the restraints at sentencing and asked the trial court whether measures should be taken to prevent the jurors from seeing Mr. Whatley in shackles.  The prosecutor told the trial court that he "was just wondering about the chains."  The only response of Mr. Whatley's counsel was, "Well, he's convicted now."  This exchange reveals that the prosecutor would not have opposed an objection if Mr. Whatley's counsel had raised one (and would not have requested that Mr. Whatley be in shackles, particularly given that he was planning on having him re-enact the murder in front of the jury).  Second, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.  It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency."  *Strickland*, 466 U.S. at 694.  As the Georgia Supreme Court noted, the standards governing shackling at the time, even at a sentencing hearing, strongly suggested that it was unconstitutional to shackle capital

84

defendants in front of the jury without a showing that the particular defendant presented a security risk. *See, e.g.*, *Moon v. State*, 375 S.E.2d 442, 459 (Ga. 1988) (citing *Elledge*, 823 F.2d at 1451). Third, the prosecutor never presented any evidence that warranted such a security measure. Proceeding on the assumption that the trial court was aware of the applicable authority at the time of the sentencing hearing, as *Strickland* instructs, it is reasonably probable that it would have taken measures to shield Mr. Whatley's shackles from the jury's view. For example, it could have had Mr. Whatley walk to the witness box when the jury was out of the courtroom and could have had him re-enact the crime from the witness box, where his shackles were not visible.

The Georgia Supreme Court did not base its prejudice ruling on whether or not the objection would have been successful. That is to say, it did not hold that the failure to object was not prejudicial because the trial court would have overruled such an objection. Rather, it held that, "in view of the balance of evidence presented at trial," the shackles did not affect the outcome. *Whatley*, 668 S.E.2d at 663. That analysis was deficient.

To decide whether a defendant was prejudiced by ineffective assistance of counsel at sentencing, we typically correct for counsel's error and "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). But in the shackling context, the

85

Supreme Court has explained that the sight of visible restraints "inevitably undermines the jury's ability to weigh accurately all relevant considerations— considerations that are often unquantifiable and elusive—when it determines whether a defendant deserves death." *Deck*, 544 U.S. at 633. *See also Elledge*, 823 F.2d at 1450 ("[A] jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision."). The Georgia Supreme Court did not take this inherently prejudicial effect into account. Nor did it factor in the re-enactment of the murder in front of the jury or the prosecutor's dogged focus on future dangerousness. *See Whatley*, 668 S.E.2d at 663.

The majority, like the Georgia Supreme Court, distinguishes the Supreme Court's opinion in *Deck* because that case involved a due process challenge on direct appeal and not an ineffective assistance of counsel claim. This distinction, however, is one without a difference. The question for us is whether Mr. Whatley was prejudiced by being shackled during sentencing in front of the jury while he re-enacted his crime with the prosecutor (the avenging angel who later asked for death) playing the victim.

*Deck* speaks directly to that issue: "The appearance of the offender during the penalty phase in shackles [ ] almost inevitably implies to a jury, as a matter of

86

common sense, that court authorities consider the offender a danger to the community." *Deck*, 544 U.S. at 633. We have recognized that reality as well. *See United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir. 2002) ("One of the most prominent concerns about the use of most methods of restraint comes from the possibility of prejudice to the defendant if those restraints are visible to the jury."); *Elledge*, 823 F.2d at 1451 (stating that "[w]hen shackling occurs, it must be subjected to close judicial scrutiny," and a court must consider "whether less restrictive, less prejudicial methods of restraint were considered or could have been employed") (citations omitted). *See also Stephenson v. Neal*, 865 F.3d 956, 959 (7th Cir. 2017) ("The possibility that the defendant's having to wear [a visible] stun belt—for no reason, given that he had no history of acting up in a courtroom—contaminated the penalty phase of the trial persuades us to reverse the district court's denial of Stephenson's petition for habeas corpus [claiming ineffective assistance of counsel.]"); *Roche v. Davis*, 291 F.3d 473, 484 (7th Cir. 2002) (granting habeas relief under § 2254(d) on an ineffective assistance of counsel claim because "the extreme inherent prejudice associated with shackling," along with "the considerable mitigating evidence," established a reasonable probability that the outcome would have been different if counsel had not failed to object to shackling the defendant at sentencing).

87

The majority points out that I have only been able to cite two cases where a court found *Strickland* prejudice due to shackling.  *See* Majority Op. at 77 n.63.  I concede that this case presents a somewhat unique basis for an ineffective assistance claim—where defense counsel neglected to object to his client being shackled while he was forced to re-enact the murder in front of the jury and where the prosecutor focused on future dangerousness to justify the death penalty.  I would point out, however, that the majority does not cite a single case where a court concluded that the defendant was not prejudiced under comparable circumstances.  It instead relies on two cases where there was no evidence that the jury ever saw the defendant in shackles.  *See Jones v. Secretary*, 834 F.3d 1299, 1319 (11th Cir. 2016); *Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1309 (11th Cir. 2005).

The majority claims not to "discount[ ] the effect that shacking has on a jury," and distinguishes *Deck* because Mr. Whatley did not raise a substantive shackling claim on direct appeal.  *See* Majority Op. at 76 n.62.  Yet the majority sidesteps the language in *Deck*—and in *Elledge*—describing the inherent prejudice that shacking causes in this context.  It is telling that the majority devotes several pages to explaining that we do not presume prejudice when the defendant challenges his shackling through an ineffective assistance claim, but devotes only

one paragraph to whether there is a reasonable probability that the shackling here affected the outcome at Mr. Whatley's capital sentencing hearing.

**B**

Mr. Whatley's crime, like all murders, was a terrible offense which deserved severe punishment. But the question the jury faced was whether that punishment should be death—the ultimate sanction imposed by society. Although the murder was committed during an armed robbery, Mr. Whatley's criminal past was relatively minor, and he did not have a significant history of violence. He had prior convictions for forgery and simple assault, and when he was a teenager, he was convicted of a robbery in Washington D.C. for stealing one dollar.

At sentencing, the prosecutor presented evidence regarding Mr. Whatley's alleged lack of remorse. The centerpiece of the state's lack-of-remorse argument was that Mr. Whatley had expressed concern over missing the Super Bowl because he had to be in court. In response, defense counsel called mitigation witnesses to testify on Mr. Whatley's behalf. They explained that Mr. Whatley had been abandoned by his mother, that he had redeeming qualities, and that he was deserving of forgiveness.

The jury found two statutory aggravating circumstances: (1) the crime was committed while Mr. Whatley was engaged in the commission of an armed robbery; and (2) Mr. Whatley committed the crime after escaping from a place of

lawful confinement (Mr. Whatley had fled from a halfway house).  These statutory aggravators, while serious, are not the worst of the worst.  I cannot agree with the majority that the aggravating circumstances in this case were so overwhelming that they rendered "trivial" the sight of Mr. Whatley re-enacting his crime while in chains.  This is especially true given that the prosecutor repeatedly argued that Mr. Whatley's future dangerousness demanded the death penalty.

I might agree with my colleagues had the shackles merely been visible to the jury when Mr. Whatley walked to the witness box.  Or if the trial court had given a curative instruction to the jury about the restraints.  Or if Mr. Whatley was not forced to re-enact the murder in front of the jury while the prosecutor played the role of the victim.  Or if the prosecutor had not explicitly made Mr. Whatley's future dangerousness a key theme in favor of his request for death.  But prejudice under *Strickland* requires a holistic inquiry, and here the confluence of circumstances leaves me no doubt that there was prejudice.

In determining whether Mr. Whatley was prejudiced, the majority does not consider the circumstances under which the jury saw Mr. Whatley in shackles.  That context, I think, is essential.  The "concept of prejudice is defined in different ways depending on the context in which it appears," and "when a court is evaluating an ineffective-assistance claim, the ultimate inquiry must concentrate on the 'fundamental fairness of the proceeding.'"  *Weaver v. Massachusetts*, 137 S.

90

Ct. 1899, 1911 (2017).  Starting with the recognition that visible shackling is "inherently prejudicial," *see Holbrook v. Flynn*, 475 U.S. 560, 568 (1986), the degree of prejudice mounts as one considers how visible the shackles were and how Mr. Whatley was forced to wear them while he re-enacted the murder.  *See Durham*, 287 F.3d at 1305 (noting that, compared to a stun belt, "handcuffs . . . are not so easily concealed, and the possibility of prejudice is more obvious in such cases").  When considered together with the prosecutor's focus on future dangerousness during closing argument, the prejudice in *Strickland* terms is undeniable.

## III

The Georgia Supreme Court committed three errors which rendered its prejudice determination unreasonable under § 2254(d)(1).  First, it did not take into account the inherently prejudicial effect of shackling in a capital case.  Second, it did not consider the fact that Mr. Whatley had to re-enact the murder in front of the jury in shackles with the prosecutor playing the victim.  Third, it failed to account for the prosecutor's focus on future dangerousness in asking for the death penalty.  It is "reasonably probable" that at least one juror's decision was tipped in favor of death due to counsel's failure to object, and that sufficiently undermines confidence in the outcome.  I would grant Mr. Whatley partial habeas relief and require the state to provide him a new sentencing hearing.

91